No. 24-2264

# In the United States Court of Appeals
## FOR THE FOURTH CIRCUIT

WALTER R. DAVIS,

*Plaintiff – Appellee,*

v.

BIMBO FOOD BAKERIES DISTRIBUTION, f/k/a BIMBO FOODS
DISTRIBUTION, INC.,

*Defendant – Appellant.*

On Appeal from the U.S. District Court for the District of Maryland
No. 8:22-cv-00663, The Honorable Peter J. Messitte

# BRIEF OF APPELLANT

RANDALL M. LEVINE
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

MICHAEL J. PUMA
SHANNON L.C. AMMON
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Defendant-Appellant*

# DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant-Appellant Bimbo Food Bakeries Distribution, LLC makes the following disclosure:

1.  Is party/amicus a publicly held corporation or other publicly held entity?

    No.

2.  Does party/amicus have any parent corporations?

    Yes.  Bimbo Bakeries USA, Inc. ("BBUSA") is the sole member of Bimbo Foods Bakeries Distribution, LLC ("BFBD").  BBUSA is a wholly owned subsidiary of Bimbo Bakeries Inc.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

    Bimbo Bakeries Inc. is not publicly held and is a wholly owned subsidiary of Grupo Bimbo S.A.B. de C.V., which is traded on the Mexican stock exchange.  No publicly held corporation owns 10% or more of BBUSA's stock.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

    No.

5.  Is party a trade association?

    No.

6.  Does this case arise out of a bankruptcy proceeding?

    No.

7.     Is this a criminal case in which there was an organizational victim?

No.

Dated: March 24, 2025         s/ Randall M. Levine

RANDALL M. LEVINE

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ....................................................................................i

TABLE OF AUTHORITIES .....................................................................................v

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION..........................................................................4

STATEMENT OF ISSUES ......................................................................................4

STATEMENT OF THE CASE...................................................................................4

I.      Facts Found By The District Court. ..............................................................4

      A.      The Parties' Distribution Agreement. ...................................................4

      B.      The Kroger-Ocado Automated Fulfillment Center Opens in
              2023. ...................................................................................................6

II.     Relevant Procedural History.........................................................................10

      A.      The District Court Denied the Parties' Cross-Motions for
              Summary Judgment............................................................................11

      B.      The District Court Held a Bench Trial and Admitted Parol
              Evidence on the Meaning of "Retail Store" and "Store Door
              Delivery." ..........................................................................................12

      C.      The District Court Held That BFBD Breached the Contract..............12

SUMMARY OF THE ARGUMENT ......................................................................20

STANDARD OF REVIEW ....................................................................................25

ARGUMENT ..........................................................................................................25

I.      Pennsylvania Law Requires Courts to Interpret Contract Terms
      According to Their Ordinary Meaning...........................................................25

II.     The Fulfillment Center Is Not an "Outlet."..................................................28

A.       The Ordinary Meaning of "Retail Store" Excludes the Fulfillment Center. ............................................................................28

B.       The Fulfillment Center is Not an "Outlet" Because It Does Not Purchase Products By "Store Door Delivery." ...................................29

III.    The District Court's Interpretation of the Distribution Agreement Deviates from Ordinary Meaning and Ignores Contractual Context. ...........33

A.       The District Court's Interpretation of "Retail Store" Violates Pennsylvania Law................................................................................33

B.       The District Court's Definition of "Store Door Delivery" Conflicts with the Contractual Context...............................................39

CONCLUSION.........................................................................................................43

CERTIFICATE OF COMPLIANCE.......................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
  247 F.3d 79 (3d Cir. 2001) .................................................................26, 27, 33

*Butters Living Tr. v. SWEPI, LP*,
  No. 12-cv-02010, 2013 WL 3679533 (M.D. Pa. July 12, 2013)..................25, 26

*Butts v. United States*,
  930 F.3d 234 (4th Cir. 2019) ...............................................................25

*DiNenna v. DiNenna*,
  304 A.3d 738 (Pa. Super. Ct. 2023)...........................................................35, 36

*Donnert v. Feld Ent., Inc.*,
  No. 13-cv-40, 2013 WL 12097618 (E.D. Va. Nov. 8, 2013)..........................37

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
  66 F.3d 604 (3d Cir. 1995) ...............................................................26

*Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*,
  831 F.2d 1238 (4th Cir. 1987) ...........................................................37

*Franze v. Bimbo Bakeries USA, Inc.*,
  826 F. App'x 74 (2d Cir. 2020) .........................................................30

*Kripp v. Kripp*,
  849 A.2d 1159 (Pa. 2004)...................................................................25

*Kushon v. Shumaker*,
  No. 1119-cv-2013, 2014 WL 10917662 (Pa. Super. Ct. June 23, 2014) ...........40

*Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*,
  908 A.2d 888 (Pa. 2006).....................................................................28

*Meyer-Chatfield v. Century Bus. Servicing, Inc.*,
  732 F. Supp. 2d 514 (E.D. Pa. 2010)...........................................................36, 37

*Pastor v. State Farm Mut. Auto Ins. Co.*,
487 F.3d 1042 (7th Cir. 2007) .................................................13, 34

*Seven Springs Farm, Inc. v. Croker*,
748 A.2d 740 (Pa. Super. Ct. 2000)................................................26

*Starling v. Lake Meade Prop. Owners Ass'n, Inc.*,
162 A.3d 327 (Pa. 2017)..........................................................39

*Steuart v. McChesney*,
444 A.2d 659 (Pa. 1982)......................................................26, 39

*United States v. Crawford*,
239 F.3d 1086 (9th Cir. 2001) ......................................................38

*Ward v. Nat'l Geographic Soc'y*,
284 F. App'x 822 (2d Cir. 2008) ...................................................13

**STATUTES**

13 Pa. Con. Stat. § 1303...............................................22, 35, 36

28 U.S.C. § 1291 .........................................................................4

28 U.S.C. § 1332 .........................................................................4

**RULES**

FED. R. APP. P. 4..........................................................................4

FED. R. EVID. 407 .......................................................................34

**OTHER AUTHORITIES**

"Retail store," *Merriam-Webster.com Dictionary*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/retail%20store. ...............2, 14, 20

Dictionary of International Trade (9th ed.)......................................17, 23

# INTRODUCTION

This appeal arises from a dispute over interpretation of a contract between Plaintiff Walter Davis ("Davis") and Defendant Bimbo Foods Bakeries Distribution, LLC ("BFBD"),[1] and presents a single question of law: whether a fully automated e-commerce fulfillment center (the "Fulfillment Center"), is an "Outlet" as defined in the parties' contract, where "Outlet" means a "retail store" that "purchase[s] Products by store door delivery."

BFBD is a national baked goods manufacturer that distributes its products through independent contractors under contracts called Distribution Agreements. Davis is an independent contractor who has distributed BFBD's products to Outlets in his exclusive territory in Maryland since 2011. The parties now dispute whether the Distribution Agreement gives Davis the exclusive right to service the Fulfillment Center, a 350,000 square foot warehouse owned and operated by Kroger-Ocado, where products are received and stored until being shipped out to on-line purchasers or to Kroger grocery stores. Davis contends that the Fulfillment Center is a "retail store" for which he has exclusive distribution rights and that BFBD breached the contract by refusing to permit him to service the Fulfillment Center.

The Fulfillment Center is a fully automated facility primarily operated by over a thousand robots that travel at 60 miles an hour as they zoom around the warehouse

---

[1]     Formerly known as Bimbo Foods Bakeries Distribution, Inc.

moving merchandise. No customers are permitted into the Fulfillment Center, and no sales or other business are transacted there.

"Retail store" is unambiguous and has a commonly understood, ordinary meaning: "a place of business usually owned and operated by a retailer … in which merchandise is sold primarily to ultimate consumers."[2] The Fulfillment Center is not a "place of business … in which merchandise is sold," and thus is not a "retail store" under the Distribution Agreement. *Id.*

The contractual context further confirms that the parties intended "retail store" to carry its ordinary meaning, because it defines "Outlet" as a "retail store" that purchases products via "store door delivery." While the Distribution Agreement does not define "store door delivery," other contractual provisions supply its meaning. For example, Section 4.1 obliges distributors like Davis to maximize sales by stocking shelves, rotating out stale product, and displaying marketing materials on store shelves. JA119. None of these ancillary tasks can be undertaken at the Fulfillment Center because entry is forbidden, and it has no shelves to stock—further evidence that the parties did not intend for a fully automated facility like the Fulfillment Center to be considered a "retail store."

---

[2]     "Retail store," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retail%20store. Accessed 24 Mar. 2025.

Nevertheless, the District Court reached the opposite conclusion following a bench trial, holding that "retail store" means "a place of business that sells goods directly to the consumer," but "does not exclude a retailer that takes orders from customers online … without the customers entering a brick and mortar location." JA2434. The District Court further found the requirement that an Outlet purchase products via "store door delivery" immaterial because "store door delivery" means nothing more than dropping product off at a location, which can be done at the Fulfillment Center. Based on these definitions, the District Court found BFBD in breach of the contract and awarded Davis more than $400,000 in damages.

The District Court's re-definitions of "retail store" and "store door delivery" are wrong and inapplicable to the Fulfillment Center even on their own terms, and the path the District Court took to reach its labored interpretations of the Distribution Agreement is littered with reversible legal error.

For all the reasons set out below, this Court should reverse the District Court's decision. This Court should hold, as a matter of law, that the Fulfillment Center is not an "Outlet" under the Distribution Agreement, that BFBD accordingly has not breached the agreement, and that judgment should be entered in favor of BFBD.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1332(c), Plaintiff is a citizen of Maryland and Defendant is a citizen of Delaware and Pennsylvania.

The district court entered its Final Order of Judgment on June 25, 2024, and Defendant filed a timely notice of appeal on July 22, 2024. JA2455; JA2457; *see* FED. R. APP. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether a fully automated e-commerce Fulfillment Center—a warehouse where goods are stored until they are shipped either to on-line purchasers or to grocery stores, in which no members of the public are permitted, and in which no products are sold—is an "Outlet" under the parties' Distribution Agreement, where "Outlet" means "all retail stores … which purchase Products by store door delivery."

## STATEMENT OF THE CASE

### I.    Facts Found By The District Court.

#### A.    The Parties' Distribution Agreement.

BFBD is a nationwide baked goods manufacturer of popular and well known products, such as Sara Lee breads and Entenmann's donuts and cookies. JA2425. Among other methods of distributing and selling its products, BFBD enters into

contracts with independent third-parties who purchase products from BFBD and resell them to grocery stores and other similar Outlets within an exclusive geographic territory. *Id.*

In January 2011, Davis purchased from BFBD "the sole right to sell and distribute Products to Outlets" within a defined geographic area in Maryland, and their arrangement is memorialized in a contract called a Distribution Agreement. *Id.*; JA41; *see* JA34; JA37. The Distribution Agreement defines the "Products" that Davis can purchase from BFBD and sell as "all those bakery products as specifically defined and described in Schedule B." JA2459; JA41. Pursuant to Schedule B, Davis has the right to sell bakery products sold under the following names and trademarks: Anzio & Sons, Arnold, Bakers Pride, Ball Park, Beefsteak, Butter Krust, Earthgrains, Eureka, Holsum, Thomas' and Sara Lee. JA41; JA59.[3] BFBD (or its affiliates) manufacture other products that Davis does not have the right to sell and distribute, such as Entenmann's and Stroehmann. JA1895.

Davis may sell Products only to "Outlets," which are "those purchasers of products as specifically defined and described in Schedule B." JA41. Schedule B defines "Outlets" as "all retail stores restaurants and institutional accounts which

---

[3] The Distribution Agreement is governed by Pennsylvania law. JA2429; JA56 ("The validity, interpretation, and performance of [the Distribution] Agreement is controlled by and construed in accordance with the laws of the Commonwealth of Pennsylvania.").

5

purchase Products by store door delivery." JA2426; JA59; JA1437-1438.[4]

Davis continues to operate his successful business with BFBD, servicing many Outlets in his exclusive territory including grocery stores and similar locations. JA2427. The Distribution Agreement obligates distributors like Davis to do more than just deliver products to Outlets:

> [i]n order to maximize its purchases from BFBD, [Davis] agrees to develop and maximize sales of products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in Outlets; rotating Products to promote their sale before they become stale or off code Products; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.

JA2426-2427; JA45. Consistent with the Distribution Agreement's requirements, in the ordinary course, when Davis delivers product he also stocks shelves, rotates products, replaces stale products, and puts up promotional materials. JA2426-2427.

**B.    The Kroger-Ocado Automated Fulfillment Center Opens in 2023.**

The business relationship between Davis and BFBD continued without issue from 2011 until February 2020, when Davis learned that Kroger-Ocado had plans to open an automated grocery fulfillment center in Frederick, Maryland. JA2428.

---

[4]    Davis has argued only that the Fulfillment Center is a "retail store," and has not argued that it is a "restaurant" or an "institutional account." Davis testified that he understands an "institutional account" to refer to Outlets like hospitals, schools, or prisons. *See* JA1507.

While the concept of a "fulfillment center" has existed historically, the fully automated fulfillment center is a new innovation of the last five years. *Id.* n 4.

Kroger-Ocado is a national grocery retailer with more than 1,000 suppliers. JA2428; JA1980. On January 23, 2020, Kroger-Ocado announced the development of a "350,000-square-foot" fulfillment center in Frederick, Maryland, "to service several markets, including Washington, DC, Baltimore, and Philadelphia." JA706; JA2283; JA1600. Kroger-Ocado has described its fulfillment centers and the robotic retrieval system they utilize as operating "with around 1,000 robots working along with 400 of the retailer's associates to pick, sort and ship orders" and has said that the "robots 'whizz' around giant 3D grids, orchestrated by proprietary air-traffic control systems in the unlicensed spectrum." JA707.

At the time of the trial, there were eight similar Kroger-Ocado automated fulfillment centers. JA1970-1971; JA2033-2034. The Fulfillment Center in Maryland is an automated warehouse facility with digital and robotic capabilities. JA2428. The public, including customers, are prohibited from entering the Fulfillment Center. *Id.*; JA1976-1982. Davis would not be permitted to enter the Fulfillment Center and could not stock shelves, rotate stale products, or place promotional materials. JA1977-1978. Vendors making deliveries to the Fulfillment Center are restricted to the back receiving area. JA1711.

Kroger-Ocado orders Products directly from suppliers for delivery to its fulfillment centers. JA1986. Kroger-Ocado decides the many units of Products it will purchase. JA1639-1640. Kroger-Ocado purchases, in part, Bimbo-branded products that Davis does not own the rights to distribute and generates "one purchase order" for all Bimbo-branded products. JA1655; JA1987.

After suppliers deliver to the Fulfillment Center, Kroger-Ocado employees "decant the products, which is basically taking it from the trucks and then they put it into what they call the hive, which is where the product is stored." JA1976. The "hive" is "like a giant Rubik's cube that's the size of a football field with [] little laundry baskets in squares; and within each of those baskets is a product or products that are decanted into those." *Id.*; *see* JA2035 (describing the hive as "two football fields' length and maybe a football field wide. There are all these bins with robots on the top that pick – they move product around in the hive for the orders").

The hive is operated by thousands of robots travelling at speeds of up to 60 miles per hour. JA1976-1977. Humans are not permitted to enter the hive for safety reasons. JA2036; JA2617. The inside of a Kroger-Ocado fulfillment center is depicted in the pictures below:





JA2621–22.

The Fulfillment Center operates as the "hub" within a large-scale "hub and spoke" delivery network, such that many of the products stored at the Fulfillment Center are not shipped directly to an "end consumer," but instead are shipped to a "spoke" location, *i.e.,* a Kroger-Ocado grocery store, within Kroger-Ocado's broader distribution network. JA406. In this way, for certain end-user customers, the Fulfillment Center merely occupies one step in a longer distribution chain. *Id.*

## II. Relevant Procedural History

Davis filed his complaint against BFBD alleging Breach of Contract (Count I) and Anticipatory Breach of Contract (Count II), and sought a Declaratory Judgment (Count III). JA21; JA28-32. Davis alleges that on or about January 29, 2023, BFBD began selling and delivering its products to the Kroger Fulfilment Center via means other than Davis's service, purportedly in breach of the parties' Distribution Agreement granting Davis exclusive distribution rights within his territory. JA1548. Davis contends that he possesses the exclusive right to distribute to the Fulfillment Center and that by servicing the Fulfillment Center via means other than Davis, BFBD has breached the Distribution Agreement.

Davis seeks an injunction requiring BFBD to recognize his Distribution Rights with respect to the Fulfillment Center and enjoining BFBD from servicing the Fulfillment Center by or through any other method, distributor, or employee. JA28-30. Davis further seeks alleged "lost revenues" arising from BFBD's

purported breach of the contract, and "anticipated future lost revenues" purportedly arising from the breach. *Id.* Davis further seeks a declaratory judgment that the Fulfillment Center is an "Outlet" under the Distribution Agreement. JA30-31.

## A. The District Court Denied the Parties' Cross-Motions for Summary Judgment.

After the conclusion of discovery the parties filed cross-motions for summary judgment. *See* JA172; JA692. Both parties argued that there were no disputed issues of material fact and that the question before the District Court was a question of contract interpretation to be decided as a matter of law. *See* JA172; JA692. While the parties' disagreed over the correct interpretations of "retail store" and "store door delivery," they agreed that both terms are unambiguous and should be interpreted according to their ordinary meaning. *See* JA199; JA709-710.

The District Court denied the parties' cross-motions for summary judgment, but instead of issuing a written opinion it explained its reasoning in a pre-argument letter to the parties:

> A review of your pleadings indicates that both sides appear to believe the contract language at issue is unambiguous and the Court should decide the case as a matter of law. It is a somewhat odd circumstance, that both sides argue unambiguity but reach considerably different conclusions about that meaning. That said, the Court suggests that the matter might be better resolved by a trier of fact, either a judge or jury.

> The Court's concern is that if it decides in favor of one party and against the other on summary judgment, which is what it is being asked to do, the opposing side will claim an appealable issue because the question should have gone to a trier of fact.

I am fully prepared to decide the matter as a trier of fact, just as judges often do on cross motions for summary judgment under the Individuals with Disabilities Education Act ("IDEA").

Unless you are agreeable to having me decide the case as a trier of fact, I will be uncomfortable ruling one way or another on summary judgment at this time.

JA1065.

The District Court thereafter denied both cross-motions for summary judgment and determined to hold a bench trial. *See* JA1066.

### B. The District Court Held a Bench Trial and Admitted Parol Evidence on the Meaning of "Retail Store" and "Store Door Delivery."

The District Court held a four-day bench trial from November 13, 2023 to November 16, 2023. During the trial, Davis withdrew Count II for Anticipatory Breach of Contract. *See* JA2455. Davis testified and called several lay witnesses to testify about their opinions about the meaning of the Distribution Agreement's terms "retail store" and "store door delivery." *See* JA1422; JA1679; JA1741.

### C. The District Court Held That BFBD Breached the Contract.

***The District Court's Interpretation of "Retail Store."*** Based on the facts found at trial, the District Court interpreted the term "retail store" in the Distribution Agreement. To guide its interpretation, the District Court found that where a contract term is unambiguous, it is appropriate to consult the dictionary definition to determine its ordinary usage. JA2430. But the District Court further held that there

12

is an "important corollary to the plain meaning/ambiguity analysis" in that, according to the District Court, where the parties have "engaged in a course of dealing or a course of performance during which they have effectively given meaning to the terms of the contract," the District Court may consider parol evidence relating to course of dealing to interpret the contract. *Id.* (citing *Ward v. Nat'l Geographic Soc'y*, 284 F. App'x 822, 823–24 (2d Cir. 2008)).

The District Court further found that "there is also authority to the effect" that a court may consider parol evidence of a "contract term in a subsequent comparable contract," even if it not "'confessing' that the original term means the opposite of what the amending party meant in the original contract," because such evidence can be used to establish a "latent ambiguity of the original term, permitting recourse to parol evidence." JA2430-2431 (citing *Pastor v. State Farm Mut. Auto. Ins. Co*, 487 F.3d 1042 (7th Cir. 2007)). Armed with these "background principles," the District Court concluded that the terms "retail store" and "store door delivery" were "sufficiently ambiguous enough to invite consideration of parol evidence." JA2431.

With respect to the term "retail store" as used in the Distribution Agreement, the District Court observed that BFBD's interpretation of a "retail store" as only "brick and mortar retail locations that customers can enter to purchase goods at a point-of sale check out inside the building" was belied by a "recent amendment" to

13

BFBD's distribution agreements with other contractors, which the District Court found cut against BFBD's interpretation. JA2431-2432.

The District Court further found that as of 2011, when Davis entered into his Distribution Agreement with BFBD, "fulfillment centers, while not yet automated, were already coming into existence," and on that basis, the term "retail store" in the agreement "could well be understood to cover places of business that sell goods to the ultimate consumer online, with little or no entry of the consumer to the store." *Id.* That possibility, the District Court concluded, creates an "ambiguity" in the term "retail store," which the District Court found could not be resolved by looking to dictionary definitions. JA2432.

Looking to the Merriam-Webster's Online Dictionary, the District Court found that a "retail store" is defined as "a place of business usually owned and operated by a retailer in which merchandize is sold primarily to ultimate consumers." *Id.* The District Court found this definition unsatisfying because it "implies that merchandize must be sold in a place of business for it to constitute a retail store," but fails to specify "that customers must physically buy the merchandize from within the store itself." *Id.* (emphases in original). Because "[m]erchandise could be sold and purchased entirely online" the District Court found that "retail store" is "'reasonably susceptible of more than one meaning.'" *Id.* (citation omitted).

The District Court therefore looked to Davis's trial testimony, in which he offered his subjective opinion that under the Distribution Agreement, "a retail store … refers simply to an entity that 'sells product to [the final] consumer.'" *Id.* (citation omitted). The District Court compared Davis's subjective opinion with the subjective opinions of "other BFBD employees who testified at trial," who testified to their subjective understandings that a "retail store" is "[a]ny outlet that is offering goods for purchase by a consumer for their own consumption and/or use." *Id.*

While BFBD had maintained its objection to the introduction of parol and any other evidence throughout the trial (*e.g.,* JA1261; JA1355; JA2423), subject to that objection BFBD introduced the testimony of an expert witness, Dr. Richard J. George, to opine about the meaning of the term "retail store" as it is used in the retail food industry. JA811, JA944; JA2042. He testified generally that in its industry context, "retail store" refers to places "like a grocery store, a supermarket, a CVS, convenience store, even a Costco" which are stores that "offer products for sale, which customers can come in" to purchase. JA2062. The District Court disregarded Dr. George's opinion, however, because the District Court found it conflicted with the testimony of Davis and the "former BFBD employees" who had testified on Davis's behalf, and because Dr. George could not locate "any written authorities" consistent with his opinion. JA2433.

Based on the foregoing, the District Court found that the term "retail store" as used in the Distribution Agreement "means a place of business that sells goods directly to the consumer," and "does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contact, without the customer entering a brick and mortar location." JA2434. The District Court found that the Fulfillment Center satisfies the District Court's new, bespoke definition of "retail store" because, according to the District Court, the Fulfillment Center is "a place of business that sells goods to consumers." *Id.*

***The District Court's Interpretation of Store Door Delivery.*** BFBD argued at trial (as it had argued previously on summary judgment) that under the Distribution Agreement the Fulfillment Center could not be a "retail store" for the additional reason that it does not "purchase Products by store door delivery." JA2428-2429. Store door delivery is not a defined term in the Distribution Agreement, but BFBD argued that its meaning is derived from the contractual context, because, among other things, other contract terms obliged distributors not only to deliver goods, but to stock shelves, rotate product, and support promotions. *See* JA2439. Davis, on the other hand, argued that "store door delivery" means only dropping product off at a location by a truck. *See* JA2429.

The District Court found that "store door delivery" has "no plain meaning, so resort to parol evidence is in order." JA2434. By "parol evidence," the District

16

Court meant evidence about "the course of dealing and course of performance as between the parties," including "the testimony of BFBD employees," all of which the District Court found "militate in favor of Davis's interpretation of the term." JA2434-2435.

The District Court first looked to the 9th Edition of the Dictionary of International Trade, which defines "store-door delivery" as "[t]he movement of goods to the consignee's place of business, customarily applied to movement by truck." JA2435. The District Court further relied on the testimony of Davis's lay witnesses, who testified that in their subjective opinions, "store door delivery" means delivery to an Outlet and does not require any additional services like stocking shelves, setting up advertising, or removing stale products. *Id.* And the District Court found that BFBD compensated Davis and other independent distributors even if, on certain occasions or for certain Outlets, they did not always "stock shelves and the like." JA2436.

The District Court also found it significant to the interpretation of "store door delivery" that from 2000-2007, one of Davis's witnesses (Mr. Wiegand) had serviced a "Giant Peapod Fulfillment Center" for another company. *Id.* The District Court found that the Peapod Fulfillment Center "was not automated," and that Weigand "was able to enter the Peapod to place products on shelves," but "at the

same time the Peapod did not function like a traditional grocery store either, in that customers could not enter to purchase products." *Id.*

The District Court acknowledged that Davis first contracted with BFBD "four years after Wiegand stopped servicing" the Peapod, and "that Wiegand's contract was not with BFBD, but with an entity that BFBD subsequently purchased." *Id.* The District Court "[n]evertheless" found that Weigand's testimony "undermines any suggestion by BFBD that, when Davis signed his Distribution Agreement with BFBD, the term 'store door delivery' was universally understood within the industry to exclude a facility that did not permit customers to enter to purchase goods." *Id.*

The District Court again discounted the testimony of BFBD's expert witness and corporate representative to the effect that "store door delivery" connotes more than merely dropping off product at a location, and further rejected the contention that section 4.1 of the Distribution Agreement—which obligates contractors to undertake services ancillary to delivery such as stocking shelves and supporting promotions—has any relationship to the meaning of "store door delivery." JA2439.

The District Court thus held, based on what it referred to as "course of dealing and course of performance" evidence, that "store door delivery" means "delivery of goods directly to a store by a vendor," and that "stocking shelves, rotating and removing product, and merchandising, are not required" to be engaged in "store door delivery." JA2440. And, because Davis "is fully capable of delivering goods

directly" to the Fulfillment Center, the District Court found that the Fulfillment Center "purchases Products by store door delivery" and so is an "Outlet" within the meaning of the Distribution Agreement. *Id.*

Applying its new definitions, the District Court concluded that because the Fulfillment Center is an "Outlet" under the Distribution Agreement, "Davis has the exclusive right to service it," and that BFBD "denied him that right and has thus breached the Parties' Distribution Agreement." *Id.* The District Court accordingly entered judgment in favor of Davis on Count I (Breach of Contract) and awarded Davis $452,343,41 in "damages." JA2450. The District Court further entered judgment in favor of Davis on Count III (Declaratory Judgment), holding that it is:

> hereby adjudged, ordered, and decreed that the Kroger Fulfillment Center constitutes an 'Outlet' and 'retail store' that purchases products by 'store door delivery' over which Davis has exclusive distribution rights under the Distribution Agreement of the parties and any other automated grocery fulfillment center in Davis's sales Area (whether it operates wholly or partially as such) is subject to the same definitions as the Court has found applicable to the Kroger Fulfillment Center.

JA2454. BFBD thereafter timely noticed its appeal on July 22, 2024. JA2457. Davis filed a Motion to Alter or Amend the Judgment the same day. JA7. On December 11, 2024, the District Court denied Davis's Motion to Alter or Amend the Judgement. JA8. On December 31, 2024, this Court docketed BFBD's appeal. *Id.*

## SUMMARY OF THE ARGUMENT

(1)     The District Court incorrectly held that the Fulfillment Center is an "Outlet" under the parties' Distribution Agreement, and the judgment below should be reversed.  The contract's text is unambiguous and its correct interpretation is evident from its plain, ordinary meaning and from the contractual context.

(2)     The term "retail store" is unambiguous and has a readily ascertainable ordinary meaning: "a place of business usually owned and operated by a retailer … in which merchandise is sold primarily to ultimate consumers."[5]  The facts found at trial—which were never disputed—establish that the Fulfillment Center is nothing like a "retail store."  It is a vast automated warehouse populated by robots in which no customer will ever set foot, not an ordinary "place of business."  Nor is the Fulfillment Center a place "in which merchandise is sold."  No sales or purchases occur at the Fulfillment Center—it is just one of many places in which merchandise may be shipped and stored along its path from the supplier to the consumer.

(3)     The correct interpretation of "retail store" is reinforced by its association with the term "store door delivery," which draws meaning from the contractual context.  For example, Section 4.1 of the Distribution Agreement shows that the parties intended for "store door delivery" to mean the provision of additional

---

[5]     "Retail store," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retail%20store.  Accessed 24 Mar. 2025.

services ancillary to simple delivery—including stocking shelves, rotating stale product, and setting up promotional materials. To be a "retail store" under the Distribution Agreement, it must be at least *possible* to provide these ancillary services, even if a store owner may sometimes prefer to stock shelves themselves. But Davis cannot provide these ancillary services to the Fulfillment Center, which forbids all non-Kroger employees, has no shelves to stock, and has no cash registers or checkout equipment. Read together, the terms "retail store" and "store door delivery" preclude any reasonable interpretation that the Fulfillment Center is an Outlet under the Distribution Agreement.

(4) The District Court reached the opposite conclusion, but its interpretation is forced and unreasonable and must be rejected. The District Court erroneously found the term "retail store" ambiguous because its common meaning, as reflected in the dictionary definition that Davis himself relied upon, "implies that merchandize must be sold in a place of business for it to constitute a retail store," and thus excludes locations involved in the selling of products exclusively on-line. JA2432. In other words, because the common meaning of "retail store" would exclude the Fulfillment Center and doom Davis's case, the District Court determined to look to other evidence from which to manufacture a new, more expansive meaning. That is contract manipulation, not contract interpretation.

(5) While the District Court purported to consider evidence of the parties' "course of performance" or "course of dealing" to aid its interpretation, in fact no such evidence exists. Under Pennsylvania law, "[a] 'course of performance' is a sequence of conduct between the parties to a particular transaction." 13 Pa. Con. Stat. § 1303(a). The parties here had no relevant "sequence of conduct" to consider because, as the District Court found, the Fulfillment Center is a "new creature of the internet" that the parties had never previously encountered. JA2424. The evidence the District Court relied upon instead of "course of performance" or "course of dealing" consisted of the irrelevant, inadmissible testimony of Davis and other lay witnesses about their subjective understanding of the meaning of "retail store."

(6) The interpretation of "retail store" the District Court ultimately reached bears no relation to an ordinary meaning of the term, is internally inconsistent, and conflicts with other provisions of the Distribution Agreement. The District Court held that "'retail store' as used in the Distribution Agreement means a place of business that sells goods directly to the consumer" but "does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contract, without the customer entering a brick and mortar location." JA2434. That is no one's common understanding of a "retail store." By itself, the first part of the District Court's definition is consistent with the common meaning but would exclude the Fulfillment Center because the Fulfillment Center *sells*

nothing—Kroger sells products on-line, and the Fulfillment Center is simply the warehouse that stores and ships those products. Attempting to solve this fatal problem in Davis's favor, the District Court invented the second part of its definition to expand the meaning of "retail store" to include both an actual "place of business that sells goods" and *not* an actual "place of business that sells goods." Under the District Court's definition, a Kroger office with computer servers used to facilitate on-line sales would be a "retail store," as would every other location Kroger owns. If the parties had intended such an expansive, counter-intuitive meaning for "retail store" the Distribution Agreement would say so instead of narrowly limiting the definition of "Outlet" to retail stores, restaurants, and institutional accounts. Nothing supports the District Court's unreasonable, self-contradictory interpretation.

(7) The same kinds of errors plague the District Court's interpretation of "store door delivery." The District Court relied primarily on a definition from the obscure Dictionary of International Trade: "The movement of goods to the consignee's place of business, customarily applied to movement by truck." JA2435. From this definition, the District Court concluded that "store door delivery" does not include any services besides delivery that would be impossible to fulfill at the Fulfillment Center, like stocking shelves, setting up promotions, or rotating out stale product. The District Court also relied on purported evidence of "course of dealing" as support for this definition, because Davis testified that sometimes a grocery store

owner may not want ancillary services like stocking shelves, and he never regarded this as meaning he was not providing "store door delivery." JA2439-2440.

(8) The District Court erred because there was no need to look to any source other than the Distribution Agreement to ascertain the meaning of "store door delivery" in the context of the parties' business relationship, and the evidence the District Court considered was irrelevant. No one testified that the parties had "International Trade" concepts in mind when they agreed to the Distribution Agreement. Nor is anecdotal testimony about store owners occasionally declining services ancillary to delivery evidence of a relevant "course of dealing" that modifies the meaning of "store door delivery."

(9) Reading the Distribution Agreement as a whole shows the parties intended for "store door delivery" to mean more than mere delivery, because the contract in Section 4.1 expressly obliges distributors like Davis to provide services ancillary to delivery. JA119. The Distribution Agreement moreover expressly contrasts "retail stores … which purchase Product by store door delivery" with other types of Outlets that are "serviced by methods other than store door delivery." JA133. Since all Outlets receive products by delivery, "store door delivery" therefore must mean something more than simple delivery—otherwise nothing would distinguish the two categories. And if the parties had intended for there to be no distinction, the contract would simply say *delivery*. That the Distribution

24

Agreement says "store door" as a descriptive of *delivery* means the parties intended the full phrase *store door delivery* to mean more than simply delivery of products to the back door, as the District Court erroneously concluded.

(10)  BFBD's interpretations of "retail store" and "store door delivery" accord with the Distribution Agreement's common meaning and give effect to all provisions of the contract.  This Court should reject the District Court's strained interpretation, reverse the judgment below, and direct the District Court to enter judgment for BFBD as a matter of law.

## STANDARD OF REVIEW

This Court reviews a "judgment following a bench trial under a mixed standard of review." *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019).  The Court reviews conclusions of law *de novo* and will reverse factual findings only if they are clearly erroneous.  *Id.*

## ARGUMENT

### I.    Pennsylvania Law Requires Courts to Interpret Contract Terms According to Their Ordinary Meaning.

Under Pennsylvania law, courts interpret unambiguous writings as a matter of law.  *Kripp v. Kripp*, 849 A.2d 1159, 1163–64 (Pa. 2004); *see Butters Living Tr. v. SWEPI, LP*, No. 12-cv-02010, 2013 WL 3679533, at *4 (M.D. Pa. July 12, 2013) ("Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to resolve the issue of interpretation

as a matter of law, typically on summary judgment."). The intent of the parties to a written contract is contained in the writing itself, and where the intention of the parties is clear, there is no need to resort to extrinsic evidence, and the meaning of a clear and unequivocal written contract must be determined by its contents alone. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc*., 247 F.3d 79, 93 (3d Cir. 2001).

"[C]ourts must, whenever possible, read contract provisions so as to avoid ambiguity." *Butters Living Trust*, 2013 WL 3679533, at \*4. "[I]n holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity." *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982). Because Pennsylvania presumes that the writing conveys the parties' intent, a contract:

> will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (citation omitted); *Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 744 (Pa.

Super. Ct. 2000) (holding that mere disagreement by the parties will not render a contract ambiguous).

To find a contract term ambiguous, "the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition." *Bohler-Uddeholm, Am., Inc.*, 247 F.3d at 92–96. A court should only interpret a contract term to mean something other than its ordinary meaning "if the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable," and where giving the term an alternative meaning is the only way to reach "the only sensible and reasonable interpretation of the contract." *Id.* at 95.

Accordingly, to identify and resolve contractual ambiguities under Pennsylvania law, the following principles apply: "(1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning." *Id.*

The District Court's interpretation of the Distribution Agreement violates all of these precepts governing the interpretation of contracts by finding ambiguity

where there is none, and by purporting to resolve that ambiguity by adopting interpretations of the contract that are unreasonable and unsupported by any evidence in the contract itself.

## II.     The Fulfillment Center Is Not an "Outlet."

To constitute an Outlet, the Fulfillment Center must satisfy two conditions: it must be a "retail store" and it must "purchase Products by store door delivery." JA115; JA133.  Both conditions are unambiguous and can be interpreted according to their ordinary meanings within their contractual context.  Neither is satisfied.

### A.     The Ordinary Meaning of "Retail Store" Excludes the Fulfillment Center.

The term "retail store" is not defined in the Distribution Agreement, but it is a commonly used, non-technical term and therefore should be interpreted according to its ordinary meaning.  Courts may "consult the dictionary definition of a word to determine its ordinary usage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006).  On summary judgment and at trial, Davis relied upon the dictionary definition of "retail store" from Merriam-Webster's on-line dictionary, which defines a "retail store" as "a place of business usually owned and operated by a retailer but sometimes owned and operated by a manufacturer or by someone other than a retailer in which merchandise is sold primarily to ultimate consumers."  JA192; JA600.

Applying this undisputed ordinary meaning here to the equally undisputed facts (which were merely confirmed at trial) compels the conclusion that the Fulfillment Center is not a "retail store." It is not a "place of business," because no business transactions occur at the Fulfillment Center—it is a storage and shipping facility operated primarily by robots. JA411; JA503; JA505; JA1976-1977. Nor is the Fulfillment Center a place "in which merchandise is sold," either to "ultimate consumers" or anyone else. Customers or other members of the public are not permitted inside the Fulfillment Center, there are no sales employees or cash registers, and no merchandise is sold on the premises. JA810. The Fulfillment Center accordingly is not a "retail store" under the ordinary meaning of the term, and no more is necessary for this Court to find that the District Court erred and the judgment below should be reversed.

### B. The Fulfillment Center is Not an "Outlet" Because It Does Not Purchase Products By "Store Door Delivery."

The Fulfillment Center also fails the second condition required to be an "Outlet" under the Distribution Agreement, because the Fulfillment Center does not purchase Product by "store door delivery." JA59. "Store door delivery" is not expressly defined by the Distribution Agreement, but its meaning can readily be derived from the text and contractual context of the Distribution Agreement. Here, "store door delivery" means the distributor's obligation to deliver product to the Outlet and, more than that, to actively work to maximize sales by providing services

ancillary to delivery such as stocking shelves, rotating out stale products, setting up promotional materials, and taking other steps to foster productive customer relationships. *See Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 78 (2d Cir. 2020) ("[A]s Appellants [independent operators] testified, operating their businesses required more than the ability to drive; their success depended on their ability to increase sales, build customer relationships, effectively identify the popularity of different products . . . ."). None of these activities are possible at the Fulfillment Center, which permits only Kroger employees to enter the facility, has no shelves to stock, and no customers to take advantage of promotions. JA810.

Support for BFBD's interpretation of "store door delivery" derives from the Distribution Agreement itself. Schedule B defines "Outlets" as "all retail stores restaurants and institutional accounts which purchase Products by store door delivery" and further provides:

> Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, **serviced by methods other than store door delivery**, or bakery thrift stores established or operated by, or contracted with [BFBD] or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which [BFBD] or its affiliates, in their sole discretion, deem appropriate to support that purpose.

JA133 (emphasis added). This provision demonstrates that not all businesses that receive deliveries of BFBD products are "Outlets" under the agreement—something more than simple delivery is required to qualify.

Section 7.2 of the Distribution Agreement likewise sheds light on the meaning of "store door delivery."  It provides:

> In the event any Outlet makes an independent determination to accept delivery of the Products by ***any method other than store door delivery***, and so informs BFBD or DISTRIBUTOR, the informed party shall promptly communicate to the other the service requirements and terms under which the Outlet now desires service, and ***provided those new service requirements continue to call for delivery*** in the Sales Area, DISTRIBUTOR shall have the first right to effect such alternative service.

JA124 (emphasis added).  Section 7.2 expressly contemplates that an Outlet may make a determination to receive BFBD products in some manner other than by "store door delivery," but that the alternative form of service may still "continue to call for delivery."  *Id.*  That is possible only if "store door delivery" means a service that is distinct from, and in addition to, the mere act of delivering BFBD products to an "Outlet."

Section 4.1 of the Distribution Agreement accordingly identifies the types of ancillary services that distinguish "store door delivery" from merely delivering product to a location:

> In order to maximize its purchases from BFBD, [Plaintiff] agrees to develop and maximize sales of products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in Outlets; rotating Products to promote their sale before they become stale or off code Products; promptly removing all stale or off code Products; [and] cooperating with BFBD or its affiliates in its marketing programs.

JA45. If an Outlet declines to accept services ancillary to delivery described in section 4.1, such as stocking shelves and promotional campaigns, a distributor may nevertheless continue to deliver BFBD products to the Outlet and be compensated, as described in Section 7.2.

However, the Distribution Agreement does not even contemplate the situation presented here, where it is physically *impossible* for Davis to provide "store door delivery" services to the Fulfillment Center. That the Fulfillment Center does not purchase product by "store door delivery" by itself precludes any finding that the Fulfillment Center is an "Outlet," and also reinforces the conclusion that the Fulfillment Center is not a "retail store," because a "retail store" is an establishment at which it is at least possible to provide "store door delivery" services.

Applying the straightforward, common meaning of "retail store" to the undisputed facts, together with an interpretation of "store door delivery" within its contractual context, leads to only one reasonable conclusion: the Fulfillment Center is not an "Outlet" under the Distribution Agreement. BFBD accordingly did not breach any obligation to Davis by prohibiting him from servicing the Fulfillment Center, and the District Court's contrary conclusion should be reversed.

### III. The District Court's Interpretation of the Distribution Agreement Deviates from Ordinary Meaning and Ignores Contractual Context.

#### A. The District Court's Interpretation of "Retail Store" Violates Pennsylvania Law.

The District Court rejected the common meaning, dictionary definition of "retail store;" found the term "retail store" ambiguous; considered irrelevant, inadmissible lay opinion testimony about the meaning of "retail store;" and ultimately invented its own bespoke definition of "retail store" based on its own conclusory assertions. JA2434. Every step of the District Court's analysis up to and including its ultimate conclusion violates Pennsylvania law and must be rejected.

"[B]ecause Pennsylvania presumes that the writing conveys the parties' intent, a contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92. The District Court found no such obscurity or "indefiniteness of expression" in the term "retail store," because none exists. Instead, the District Court found "retail store" ambiguous for reasons that defy easy description.

As a first step, the District Court incorrectly reasoned that there could be a "latent ambiguity" in the term "retail store," because a more recent version of the Distribution Agreement that BFBD has used with parties other than Davis has an

updated definition of the term. JA2431. The District Court considered this significant because it could show "latent ambiguity of the original term, permitting recourse to parol evidence," in reliance on *Pastor v. State Farm Mutual Automobile Insurance Co.*, 487 F.3d 1042 (7th Cir. 2007). JA2431. In fact, *Pastor* stands for precisely the opposite and held unequivocally that it is impermissible for courts to rely on a "subsequent version" of a contract as an interpretive aid, because "to use at a trial a revision in a contract to argue the meaning of the original version would violate Rule 407 of the Federal Rules of Evidence, the subsequent-repairs rule, by discouraging efforts to clarify contractual obligations, thus perpetuating any confusion caused by unclarified language in the contract." *Pastor*, 487 F.3d at 1045. For exactly the same reason, BFBD's recently amended Distribution Agreement is inadmissible, is not "parol evidence," and should not have been considered.

Next the District Court properly considered the dictionary definition of "retail store," which is "a place of business … in which merchandise is sold primarily to ultimate consumers," and observed that the definition "implies that merchandise must be <u>sold</u> in a place of business for it to constitute a retail store. . . ." JA2432 (emphasis in original). Exactly right. The straightforward conclusion the District Court should have drawn from the dictionary definition is that the Fulfillment Center is not a "retail store" because it is a storage and shipping facility—a warehouse— not a place in which "merchandise is sold."

But thereafter the District Court's analysis again becomes confused. It found the term "retail store" ambiguous because the dictionary definition does not "specify that customers must physically <u>buy</u> the merchandise from within the store itself," and "[m]erchandise could be sold and purchased entirely online." *Id.* But that is not an ambiguity—it just means that a business that sells merchandise "entirely online" is not a "retail store." The District Court nevertheless decided to "turn[] to other evidence in the record to interpret" the meaning of "retail store," and from there its legal errors only multiply. *See DiNenna v. DiNenna*, 304 A.3d 738 (Table) (Pa. Super. Ct. 2023) (holding that it is improper to use "extrinsic circumstances to create, rather than resolve, any latent ambiguity").

While the District Court purported to consider "course of dealing" or "course of performance" evidence, JA2439-2440, no such evidence exists that might shed light on the question whether the Fulfillment Center is a "retail store." Under 13 Pa. Con. Stat. § 1303(a), "[a] 'course of performance' is a sequence of conduct between the parties to a particular transaction" if the "the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party." 13 Pa. Con. Stat. § 1303(b) likewise defines a "'course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

Here, as the District Court found, the fully automated Fulfillment Center is an innovation of the last five years, which the parties have never encountered over the course of their contractual relationship. JA2428. There is therefore no "course of dealing" or "course of performance" between the parties dealing with a situation like the Fulfillment Center to illuminate the parties' intent.[6]

Instead of "course of performance" or "course of conduct" evidence, the District Court improperly gave controlling weight to the testimony of Davis and a few other lay witnesses about their own subjective understanding of the meaning of "retail store," but their testimony was inadmissible and irrelevant. *DiNenna*, 304 A.3d 738 ("it is not the role of the courts to focus on subjective intent in interpreting clear agreements"); *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 520 (E.D. Pa. 2010) (under Pennsylvania law, "[e]xtrinsic evidence to show ambiguity in a contract can only be evidence that addresses the meaning of a specific term in the contract, and not the subjective intent of the parties.").

---

[6]    The District Court's reliance on the testimony of a third-party witness (Wiegand) about servicing the "Giant Peapod Fulfillment Center" is improper for the same reason and should be rejected. The District Court acknowledged that Davis first contracted with BFBD "four years after Wiegand stopped servicing" the Peapod, and that "Wiegand's contract was not with BFBD, but with an entity that BFBD subsequently purchased." JA2436. Wiegand's testimony accordingly is inadmissible under 13 Pa. Con. Stat. § 1303 for the purpose of showing a "course of dealing" or "course of performance," because it not evidence of a "sequence of transactions" between the parties.

For instance, the District Court relies upon Davis's testimony that "for him, as a matter of historical practice, a retail store under the Parties' Agreement refers simply to an entity that 'sells product to [the final] consumer.'" JA2432. But there is no relevant "historical practice" of servicing things like the Fulfillment Center for Davis to look back on, and Davis's subjective opinion about the meaning of "retail store" is not "parol evidence." *Meyer-Chatfield*, 732 F. Supp. 2d at 519 (under Pennsylvania law "[p]arol evidence is any oral testimony, written agreements, or other writings *created prior to the contract* that would serve to explain or vary the terms of a contract.") (emphasis added). And even accepting Davis's subjective opinion that a retail store "'sells product to [the final] consumer" does nothing to resolve any "ambiguity" the District Court perceived, because the Fulfillment Center does not "sell products" to anyone. JA2432.

The subjective opinions of the other lay witnesses about the meaning of "retail store" that the District Court relied upon are even less helpful, not least because opinion testimony—whether from experts or lay witnesses—is inadmissible to interpret the terms of a contract. *See Donnert v. Feld Ent., Inc.*, No. 13-cv-40, 2013 WL 12097618, at *3 (E.D. Va. Nov. 8, 2013) ("The Fourth Circuit has found that whether a party breached a contract, as well as the proper interpretation of a contract, are 'question[s] of law,' and an expert cannot give an opinion as to the legal obligations of parties under a contract.") (quoting *Forrest Creek Assocs., Ltd. v.*

37

*McLean Sav. & Loan Ass'n*, 831 F.2d 1238 (4th Cir. 1987)); *see also United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) ("lay witness may not … testify as to a legal conclusion, such as the correct interpretation of a contract.").

Even if the lay witnesses' subjective opinions could be considered, they are no help to Davis. Based on the witness's testimony, the District Court found that "BFBD employees understood and understand that a 'retail store' has meant simply a facility that sells goods to consumers." JA2433. But, as noted, the Fulfillment Center is not a "facility that sells goods to consumers," it is a facility that receives, stores, and ships goods—a warehouse. JA1976-1980. If anything, the lay witnesses' testimony supports BFBD's interpretation.

Ultimately, the District Court defined "retail store" using the following formulation: "[retail store] means a place of business that sells goods directly to the consumer. It does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contact, without the customer entering a brick and mortar location." JA2434. That is no one's "ordinary meaning" definition of a "retail store." The District Court's convoluted "definition" finds no support in any dictionary. Nothing in the Distribution Agreement suggests the parties' intended to use the District Court's formulation of a "retail store." Indeed, it is not even a proper "definition," because instead of articulating what "retail store" *means,* the District Court's new formulation decides only what "retail store" *does*

*not exclude*. This is precisely the kind of "strained contrivancy" Pennsylvania law prohibits. *McChesney*, 444 A.2d at 663.

If adopted, the District Court's expansive interpretation of "retail store" would produce an absurd result that further undermines the decision below. If, as the District Court found, the Fulfillment Center is a "retail store" because it temporarily houses products that eventually may end up with an ultimate consumer, then every step in a product's supply chain from production, to storage, to shipping, is a "retail store." That makes no sense and plainly is not what the parties' intended when they signed the Distribution Agreement. *See Starling v. Lake Meade Prop. Owners Ass'n, Inc*., 162 A.3d 327, 346 (Pa. 2017) ("Ambiguities are to be resolved in favor of a reasonable rather than an absurd or unreasonable interpretation.").

The District Court's interpretation of "retail store" accordingly must be rejected, and on that basis alone, the decision below should be reversed in its entirety and judgment should be entered for BFBD.

## B. The District Court's Definition of "Store Door Delivery" Conflicts with the Contractual Context.

The District Court concluded that "store door delivery" means "delivery to the store and no more." JA2439-2440. This "definition" too fails every requirement of Pennsylvania's rules for contract interpretation. Under the Distribution Agreement, to be an Outlet the Fulfillment Center must be a "retail store . . . which purchases product by store door delivery." JA59. If "purchasing product by store

door delivery" means only "delivery to the store and no more," JA2439-2440, then the District Court's interpretation impermissibly renders the phrase "by store door delivery" superfluous. All BFBD products must be delivered one way or another, so it would make no sense for the Distribution Agreement to define an Outlet as a "retail store *to which products are delivered*." *See Kushon v. Shumaker*, No. 1119-cv-2013, 2014 WL 10917662, at \*3 (Pa. Super. Ct. June 23, 2014) (rejecting contract interpretation that would "remove all meaning" from qualifying phrase while noting that "[i]t is a well-settled rule of construction that 'no word in a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it.'").

The District Court's interpretation of "store door delivery" also conflicts with other provisions of the Distribution Agreement. For example, as discussed above, the definition of "Outlet" in the Distribution Agreement provides that "Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery[.]" JA59. If "store door delivery" means merely delivering product to the store, there could be no such thing as "methods other than store door delivery."

Similarly, Section 7.2 of the Distribution Agreement (titled "Change in Delivery Method") addresses the scenario in which an Outlet "makes an independent determination to accept delivery of the Products by any method other than store door

delivery." JA50. Based on the provisions of the Distribution Agreement, "store door delivery" must be interpreted to refer to one particular method out of a set of options for delivering goods, not delivery of goods generally.

The district court also dismissed the inconsistency between its interpretation and Section 4.1 (setting out Davis's obligations under the Distribution Agreement) as having "nothing to do with whether a location" qualifies as an Outlet. JA2439. But contracts must be interpreted as a whole and terms read in their full contractual context. Section 4.1 must be read together with the definition of an "Outlet" as a "retail store" that purchases product "by store door delivery," giving meaning both to Section 4.1's obligations and to the substance of "store door delivery." And while it is always possible (and undisputed) that an "Outlet" may not require every service listed in Section 4.1 every time a distributor delivers product, that in no way undermines the conclusion that "store door delivery" means more than just delivery.[7] Nor does it change the reality that *none* of the services set forth in Section 4.1 can possibly be undertaken at the Fulfillment Center, because it is a vast storage warehouse operated primarily by robots, with no shelves to stock, and no customers to entice into purchasing more product.

---

[7] For example, Davis testified that a store manager may tell him not to stock product on the shelves one day because "they might have somebody waxing floors" that day. JA1468 (83:21).

Like its interpretation of "retail store," the District Court improperly looked to inadmissible evidence to fashion an *ad hoc* interpretation of "store door delivery" at odds with the text and structure of the Distribution Agreement. The District Court's interpretation should accordingly be rejected.

This Court should adopt BFBD's straightforward interpretation of "store door delivery" and conclude that the Fulfillment Center therefore is not a "retail store" that "purchases product by store door delivery," and so is not an "Outlet" which Davis has the exclusive right to service. This Court accordingly should further find that the District Court's judgment finding BFBD in breach of the Distribution Agreement and awarding Davis damages must be reversed, and that judgement should be entered for BFBD as a matter of law.

~    ~    ~

## CONCLUSION

For all these reasons, this Court should reverse the decision below, find that the Fulfillment Center is not a "Outlet" under the Distribution Agreement as a matter of law, and direct entry of judgment in favor of BFBD.

Dated:  March 24, 2025            Respectfully submitted,

            s/ Randall M. Levine

Randall M. Levine
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 739-3000

Michael J. Puma
Shannon L.C. Ammon
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA  19103
(215) 963-5000

*Counsel for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the portions of the document exempted by Rule 32(f), it contains 9,674 words.

This brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

Dated:  March 24, 2025          s/ Randall M. Levine
                                RANDALL M. LEVINE

                                *Counsel for Defendant-Appellant*