# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

**WALTER R. DAVIS,**

*Plaintiff-Appellee,*

v.

**BIMBO FOOD BAKERIES DISTRIBUTION, f/k/a BIMBO FOODS DISTRIBUTION, INC.,**

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the District of Maryland
No. 8:22-cv-00663, The Honorable Peter J. Messitte

## BRIEF OF APPELLEE

Daniel Miktus
J. Travers Clark
Akerman LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel: (202) 393-6222
Fax: (202) 393-5959
daniel.miktus@akerman.com
trav.clark@akerman.com

*Counsel for Plaintiff-Appellee*

## <u>DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1, Local Rule 26.1, and Local Rule 28, Plaintiff-Appellee Walter R. Davis makes the following disclosure:

Mr. Davis is a natural person, and is not a nongovernmental corporation, and therefore no disclosure statement is required by Local Rule 26.1.

Dated: April 30, 2025

/s/ *Daniel R. Miktus*
Daniel R. Miktus
*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...................................................... ii

TABLE OF CONTENTS .......................................................... iii

TABLE OF AUTHORITIES ....................................................... v

INTRODUCTION .................................................................. 1

STATEMENT OF ISSUES ........................................................ 3

STATEMENT OF THE CASE ..................................................... 4

    I.     Facts Found by the District Court ..................................... 4

    II.    Relevant Procedural History .......................................... 15

SUMMARY OF THE ARGUMENT .............................................. 16

ARGUMENT ...................................................................... 19

    I.     The Trial Court's Path to Decision ................................. 21

    II.    Standard of Review and Governing Law ......................... 23

    III.   The Fulfillment Center is a "Retail Store" ..................... 24

         A.     *The Trial Court Reasonably Found Ambiguity* ................... 24

         B.     *The Court Properly Applied Pastor v. State Farm* ............... 29

         C.     *The Trial Court's Interpretation of "Retail Store" was Reasonable and Proper* ............................................. 31

    IV.   The Fulfillment Center Purchases Products by "Store Door Delivery" ................................................ 33

         A.     *The Trial Court Reasonably Found Ambiguity* ................... 33

         B.     *The Trial Court's Interpretation of "Store Door Delivery" was Reasonable and Proper* ............................. 37

# TABLE OF CONTENTS
## (Continued)

V.      Course of Performance and Course of Dealing ......................... 42

VI.     The Visual Appearance of the Fulfillment Center
        is Irrelevant............................................................................. 50

VII.    Harmless Error ...................................................................... 52

CONCLUSION ..................................................................................... 55

CERTIFICATE OF COMPLIANCE.......................................................... 57

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Am. Cas. Co. of Reading, Pennsylvania v. Continisio*,
819 F. Supp. 385 (D. N.J. 1993) ........................................................................ 30

*Anzora v. Lezama*,
No. 17-cv-01983-DDD-NRN, 2019 WL 3334685 (D. Colo. July 24, 2019) ..... 46

*Baldassarre v. Norfolk S. Ry. Co.*,
854 Fed. App'x. 540 (4th Cir. 2021) (per curiam) ........................................... 23

*Brosovic v. Nationwide Mut. Ins.*,
841 A.2d 1071 (Pa. Super. Ct. 2004) ................................................................ 26

*DiNenna v. DiNenna*,
304 A.3d 738 (Pa. Sup. Ct. 2023) ..................................................................... 48

*Flatley by Flatley v. Penman*,
632 A.2d 1342 (Pa. Super. Ct. 1993) ................................................................ 41

*Franze v. Bimbo Bakeries USA, Inc.*,
826 F. App'x 74 (2d Cir. 2020) ......................................................................... 35

*Gen. Refractories Co. v. First State Ins. Co.*,
855 F.3d 152 (3d Cir. 2017) .............................................................................. 47

*Goodman v. Highlands Ins. Co.*,
607 F.2d 665 (5th Cir. 1979) ...................................................................... 24, 53

*In re Unisys Sav. Plan Litig.*,
173 F.3d 145,163-164 (3d Cir. 1999) ......................................................... 24, 53

*Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*,
905 A.2d 462 (Pa. 2006) ...................................................................... 20, 31, 37

*Jones v. Benefit Tr. Life Ins. Co.*,
800 F.2d 1397 (5th Cir. 1986) ........................................................................... 30

*Lannan Found. v. Gingold*,
300 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................... 25

*Meyer-Chatfield v. Century Bus. Servicing, Inc.*,
    732 F. Supp. 2d 514 (E.D. Pa. 2010) .................................................................49

*Olbum v. Old Home Manor, Inc.*,
    313 Pa. Super. 99, 459 A.2d 757 (Pa. Sup. Ct. 1983) ........................................25

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
    487 F.3d 1042 (7th Cir. 2007) (Posner, J.) ......................................16, 17, 22, 29

*Schriefer v. Stewart*,
    892 F.2d 1041 (4th Cir. 1989 ..............................................................................3

*Sec. and Exch. Comm'n v. Ambassador Advisors, LLC*,
    No. 5:20-cv-02274-JMG, 2022 WL 2188145 (E.D. Pa. Feb. 28, 2022) ...........46

*Taylor v. Va. Union Univ.*,
    193 F.3d 219 (4th Cir. 1999) (rev'd on other grounds) .....................................52

*Ungarean v. CNA*,
    286 A.3d 353 (Pa. Super. Ct. 2022) ...................................................................35

*United States v. Offill*,
    666 F.3d 168 (4th Cir. 2011) ..............................................................................47

*United States v. Thompson*,
    229 F. Supp. 3d 91 (D. Mass. 2017) ..................................................................45

*United States v. Zehrbach*,
    98 Fed. App'x. 211 (4th Cir. 2004) ....................................................................55

*Vyanet Operating Grp., Inc. v. Maurice*,
    No. 21-cv-02085-CMA-SKC, 2023 WL 3268556 (D. Colo. May 5, 2023) ......46

*Whitmer v. Bell Tel. Co. of Pa.*,
    522 A.2d 584, 3 UCC Rep. Serv. 2d 12 (Pa. Sup. Ct. 1987) .............................42

*Wilkes-Barre Tp. Sch. Dist. v. Corgan*,
    403 Pa. 383, 170 A.2d 97 (Pa. 1961) .................................................................24

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
    746 F.3d 1008 (11th Cir. 2014) .....................................................................24, 53

## STATUTES

28 U.S.C. § 2111 .................................................................................52

13 Pa. Con. Stat. § 1303 ................................................................43, 45

## RULES

Fed. R. App. P. 32(a)(7)(B) .............................................................57

Fed. R. Civ. P. 61 ...............................................................................52

Fed. R. Evid. 103 ...............................................................................52

Fed. R. Evid. 407 ..........................................................................29, 30

Fed. R. Evid. 701 .....................................................................45, 46, 47

Fed. R. Evid. 702 ...............................................................................46

## OTHER AUTHORITIES

Dictionary of International Trade (9th Ed.) .....................................10, 38

Merriam-Webster's Online Dictionary ...................................8, 22, 25, 27

Restatement (Second) of Contracts § 202 (1981)..................................44

Restatement (Second) of Contracts § 212 (1981)........................25, 26, 33

# INTRODUCTION

Plaintiff-Appellee Walter R. Davis ("Mr. Davis") respectfully requests that this Court deny Defendant-Appellant Bimbo Foods Bakeries Distribution's ("BFBD") appeal, and affirm entry of judgment in favor of Mr. Davis.

BFBD disagrees with the trial court's overall determination that the Kroger Fulfillment Center is an "Outlet" under the parties' Distribution Agreement. However, BFBD does not identify any specific factual determinations, evidentiary rulings, or legal conclusions that it believes the trial court got wrong. BFBD has no legitimate dispute with any particular rulings by the trial court; it just wants to see if a new panel of judges might reach a different legal conclusion under the same facts.

Contrary to BFBD's position, the trial court's reasoning was sound and its conclusions correct. The court performed a plain meaning analysis on the two disputed terms at issue, but determined that they were susceptible of more than one meaning and therefore ambiguous. The court proceeded to consider parol evidence, as well as course of dealing and performance and usage of trade evidence, of the parties' intent and the meaning of those terms. The court found that **all evidence** weighed in Mr. Davis' favor. It did not find *any* evidence that supported BFBD. In sum, nothing about the trial court's decision was improper, irregular, or reversible.

BFBD's positions in the case simply were not reasonable or supportable. The trial court stated multiple times that it felt that BFBD had concocted new proposed

definitions for the disputed terms, to avoid an undesired outcome under the Agreement. The court stated, "what BFBD has proposed as a definition . . . frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with." JA2434. The court continued, "BFBD simply appears to have crafted a new melody for modern times." JA2436. The court pointed out BFBD's "conveniently malleable reading of a contract term making it possible for BFBD to cut off [a] claim for potentially thousands of dollars whenever it decided to do so." JA2438.

There was not any single piece of evidence that was dispositive to the trial court; rather the entirety of the evidence supported its judgment for Mr. Davis. For these reasons, even if this Court can find some error, the judgment should still be affirmed because it would constitute harmless error.

Under Pennsylvania law, the primary goal of contract interpretation is to ascertain the intent of the contracting parties. Mr. Davis presented the testimony of BFBD's former representative who brokered Mr. Davis' distribution rights, and was in the room when the Agreement was signed. That representative agrees with Mr. Davis' interpretation of the term. Tellingly, BFBD's Brief does not even mention this former representative. Two other former BFBD employees also support Mr. Davis' interpretation. Because the parties' intention when contracting is clear and undisputed, that should end the analysis.

For the following reasons, Mr. Davis respectfully requests that this Court deny BFBD's appeal, and affirm entry of judgment in favor of Mr. Davis.

## STATEMENT OF ISSUES

BFBD's Statement of Issues presents one issue for review: whether the Kroger Fulfillment Center is an "Outlet" under the parties' Distribution Agreement. BFBD Brief at 4. However, BFBD does not otherwise identify any discreet factual determinations, evidentiary rulings, or legal conclusions that the trial court purportedly got wrong.

This constitutes an abandonment of BFBD's ability to appeal any such determinations, rulings, or conclusions. *See Schriefer v. Stewart*, 892 F.2d 1041 (Table) (4th Cir. 1989) ("Fed. R. App. P. 28(a)(2) plainly requires that the appellant's brief contain 'a statement of the issues presented for review.' Failure to comply with this salutary rule may properly be treated as an abandonment of any issues not so stated.").

BFBD's Summary of the Argument (BFBD Brief at 20) includes 10 subsections, but again none identify any specific determinations or rulings that should be overruled. Nevertheless, BFBD seems to take issue with four rulings:

1.     The terms "retail store" and "store door delivery" are ambiguous (BFBD Brief at 20-21, Nos. 1-4);

**2.** Admitting certain evidence as "course of dealing" or "course of performance" evidence (BFBD Brief at 22, No. 5);

**3.** Interpretation of the term "retail store" (BFBD Brief at 22-23, No. 6); and

**4.** Interpretation of the term "store door delivery" (BFBD Brief at 23-25, Nos. 7-9).

**STATEMENT OF THE CASE**

**I. FACTS FOUND BY THE DISTRICT COURT.**

**Party Background**

**1.** BFBD is a baked goods manufacturer. In order to move its baked goods to facilities from which consumers can purchase them, BFBD enters into distribution agreements with intermediaries, denominated "independent distributors" or "IDs". JA2425.

**2.** Mr. Davis has worked in the grocery industry for forty-six years. JA2425.

**Distribution Agreement**

**3.** In January 2011, Mr. Davis and BFBD executed the Distribution Agreement at issue in this case (the "Agreement" or "Distribution Agreement"), pursuant to which Mr. Davis began distributing BFBD products as an ID. JA2425; *see also* JA2550.

**4.** BFBD assigns exclusive rights to IDs to operate in specific geographic areas of the country. Mr. Davis' "Sales Area" is defined in Schedule A of the Agreement, and generally covers Frederick, Maryland. JA2425, n.2.

**5.** Pursuant to the Agreement, Mr. Davis received from BFBD "the sole right to sell and distribute Products to Outlets in the Sales Area." JA2425-2426; JA2551.

**6.** The Agreement defines the term "Outlets" as "those purchasers of products as specifically defined and described in Schedule B attached hereto and made a part hereof." Schedule B provides:

> As referred to in §1.2, **Outlets shall mean all retail stores** restaurants and institutional accounts **which purchase Products by store door delivery.** Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with BFBD or its affiliates for the primary purpose of selling damaged, stale, off code products . . . .

JA2426; JA2551; JA2569.

**7.** In general, Mr. Davis has performed under the Distribution Agreement in the following fashion. He drives to BFBD's distribution warehouse in Frederick, Maryland and loads BFBD Products into his vehicle. He then drives the Products to each "Outlet" in his "Sales Area" and delivers the Products. Mr. Davis' activities often go beyond dropping Products off at the store's door. Frequently he enters Outlets to stock shelves, rotate Products, replace stale Products, and put up

promotional material. His goal is to engage in activities that will help the store maximize purchases of BFBD Products. JA2426.

**8.** Relatedly, Section 4.1 of the Distribution Agreement provides as follows:

> In order to maximize its purchases from BFBD, [Mr. Davis] agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.

JA2426-2427; JA2555.

**9.** Mr. Davis testified at trial that he undertakes the additional actions listed in Section 4.1 when an Outlet requests it and because it helps drive his sales, but he has never understood that such actions are required by the term "store door delivery," as defined in his Agreement. JA2427. In fact, Outlets have sometimes explicitly requested that Mr. Davis not take one or more of the actions listed in Section 4.1. JA2427. The level of service required from Mr. Davis varies from Outlet to Outlet and is based on the grocery manager's individual preference. JA2427. That arrangement has never, until the onset of this litigation, precluded Mr. Davis from receiving compensation from BFBD under the Distribution Agreement. JA2427.

**10.** Mr. Davis is compensated by BFBD based on his services and sales of Products. JA2427.

## Kroger Fulfillment Center

**11.** In February 2020, Mr. Davis learned that Kroger, the national grocery company, planned to open a grocery fulfillment center in Frederick, Maryland ("Kroger Fulfillment Center"). JA2428.

**12.** The Kroger Fulfillment Center is indisputably within Mr. Davis' Sales Area. JA2428; JA2606.

**13.** BFBD unilaterally determined it would not allow Mr. Davis to service the Kroger Fulfillment Center. JA2428. On or about January 29, 2023, BFBD began selling and delivering to the Kroger Fulfilment Center via means other than Mr. Davis. JA2428.

**14.** BFBD's position is that Mr. Davis does not have the right to distribute Products to the Kroger Fulfillment Center because it is not a "retail store" that "purchase[s] Products by store door delivery." JA2429. Specifically, BFBD asserts that the Kroger Fulfillment Center is not a "retail store" because it does not have "a point-of-sale check out (such as cash registers)" and because it "is not a location in which individuals purchase goods, as the public is not permitted inside." BFBD argues that the Kroger Fulfillment Center does not purchase by "store door delivery" (SDD) because SDD encompasses much more than "merely dropping off product at

a warehouse." According to BFBD, SDD requires more, such as stocking shelves, rotating and replacing products, and putting up promotional material. JA2429; JA2434.

15. Mr. Davis, on the other hand, defines a "retail store" as a place of business in which merchandise is sold primarily to ultimate consumers. Mr. Davis submits that SDD simply involves "a product being moved to an outlet, typically by truck" that "ends . . . when the receiver receives the product." JA2429; JA2432; JA2434.

## Retail Stores

16. Merriam-Webster's Online Dictionary defines the term "retail store" as "a place of business usually owned and operated by a retailer but sometimes owned and operated by a manufacturer or by someone other than a retailer in which merchandise is sold primarily to ultimate consumers." JA2432; JA3014. The trial court found that "[t]his definition implies that merchandise must be **sold** in a place of business for it to constitute a retail store, but in no way does it specify that customers must physically **buy** the merchandise from within the store itself. Merchandise could be sold and purchased entirely online." JA2432.

**17.** Three former BFBD employees testified similarly to Mr. Davis'
interpretation of the term "retail store". Michael Taylor[1] spent decades working in
the grocery retail industry and worked for BFBD from 2009 through 2018, and was
responsible for brokering the sale of distribution rights to IDs. Mr. Taylor brokered
Mr. Davis' distribution rights, and was physically present when Mr. Davis purchased
his distribution rights and signed his Distribution Agreement. Mr. Taylor testified
that a retail store is "[a]ny retail outlet that is offering goods for purchase by a
consumer for their own consumption and/or use." Mr. Taylor further testified that
he believes that an automated grocery fulfillment center qualifies as a retail store
under that definition. JA2432-2433. Former BFBD employees Rick Smith and Paul
Wiegand further support the proposition that in 2011, and even today, BFBD
employees understood and understand that a retail store has meant simply a facility
that sells goods to consumers. JA2433. The trial court found that the former BFBD
employees' understanding of the term "retail store" as of 2011 was "uniform".
JA2433.

**18.** BFBD relied almost exclusively on an expert witness, Dr. Richard
George, a professor of food marketing, for its definition of "retail store". However,
the trial court found that Dr. George's proposed definition is not how people in the

---

[1] Michael Taylor is identified in the trial court's opinion as "Sydney Taylor".
Sydney is Mr. Taylor's middle name. References to "Michael Taylor", "Sydney
Taylor", or "Mr. Taylor" are all to the same individual.

industry or BFBD employees generally understand the term. JA2433. Moreover, Dr. George and BFBD were unable to identify any written authority that supported BFBD's proposed definition of "retail store" as "a retail location where customers enter the store." JA2433-2434. The trial court found that "what BFBD has proposed as a definition is essentially at odds with the people it employs and conducts business with . . . **and frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with**." JA2434 (emphasis added).

19.     In 2011 – when Mr. Davis executed his Agreement – fulfillment centers were already in existence and accepting and delivering online orders without customers ever entering the facilities. JA2431. In the trial court's view, "[f]rom a common sense stand-point, at least, the term 'retail store' as used in the Distribution Agreement could well be understood to cover places of business that sell goods to the ultimate consumer online, with little or no entry of the consumer into the store." JA2431-2432.

## Store Door Delivery

20.     The 9th Edition of the Dictionary of International Trade, published the year before Mr. Davis signed his Agreement, defines "store-door delivery" as "(shipping) The movement of goods to the consignee's place of business, customarily applied to movement by truck." JA2435; JA3026.

**21.** BFBD relied almost exclusively on Dr. George for its definition of SDD. JA2436. Dr. George first opined that "direct store delivery" or "DSD" was synonymous with SDD. JA2435. Dr. George described The Food Marketing Institute (FMI), as "the leading food retailing association in the United States." JA2435. The FMI publishes a Food Industry Glossary, which defines DSD as "[p]roducts delivered directly to a store by the vendor, such as soft drinks, beer, bread and fresh baked goods, [etc.]." JA2435; JA3040. Dr. George conceded that FMI's definition of DSD requires that a vendor deliver products to a store and nothing more. JA2435.

**22.** The trial court found that both dictionary definitions supported Mr. Davis' definition of SDD. JA2435.

**23.** Dr. George admitted that he was not able to identify any written source to buttress his definition of SDD. JA2436-2437. To the contrary, Dr. George cited an article published in 2011 by the Grocery Manufacturers Association and Willard Bishop (the "Bishop Article"). JA2437; JA2771. The Bishop Article states in relevant part:

> Fully Integrated DSD: While the acronym DSD is used broadly, the meaning can vary. For some it is an umbrella term covering all the product arriving at a store that didn't come through the retailer's own warehouse or primary wholesaler. This ranges from specialty foods which are typically handled by a specialized distributor to greeting cards that arrive via overnight shipping services. Fully Integrated DSD gets its additional power by combining four key elements of the supply

chain: • Ordering • Warehousing and Delivery • Merchandising • Coordinating.

JA2437; *see also* JA2774.  The trial court found:

> this language cuts in a direction opposite from Dr. George's testimony. First, the text highlights that there is not a universal definition of the term direct store delivery. In fact, the Article says "the[ir] meaning can vary." *Id.* Second, though BFBD insists that activities such as merchandising, warehousing, and coordinating are included in store door delivery and direct store door delivery, the Bishop Article suggests that these elements are instead part of something with "additional power," something the Article refers to as "fully integrated direct store delivery."

JA2437.

24.    The trial court also pointed out BFBD's "**conveniently malleable reading of a contract term making it possible for BFBD to cut off an ID's claim for potentially thousands of dollars whenever it decided to do so**":

> while Dr. George at one point insisted that the term "store door delivery" requires an ID to take efforts to increase sales such as ordering product, merchandising, talking to the store, and pulling returns . . . at another point he admitted that an ID need not "necessarily do all those things" for it to constitute store door delivery. . . Similarly, when asked which actions an ID must take for it to constitute store door delivery, BFBD's corporate representative, Dissinger, testified that "there's not a complete list that you have to do every piece of" and "there's not a checklist to say [if] I do this, this, this, and this; if not it's not store door."

JA2437-2438 (emphasis added).  The court found that "**BFBD simply appears to have crafted a new melody for modern times.**"  JA2436 (emphasis added).

**25.** The same three former BFBD employees also agreed with Mr. Davis' definition of SDD. Messrs. Taylor, Smith, and Wiegand testified that while they were employed at BFBD, including in 2011, they understood the term SDD to simply mean delivery to an Outlet. All agreed that, in their experience, if an ID did not stock shelves, set up advertising displays, or remove stale products, it nevertheless constituted SDD. JA2435.

**26.** Throughout the parties' relationship, BFBD continued to compensate Mr. Davis (and other IDs) even in instances where he did not stock shelves and the like. JA2436.

**27.** Notably, Mr. Wiegand actually serviced a Giant Peapod fulfillment center in Maryland from 2000 to 2007 while working for an entity that was later purchased by BFBD. JA2436. The Peapod did not function like a traditional grocery supermarket, in that customers could not enter to purchase products. Instead, customers ordered products online and Peapod employees would select those products from the shelves to be delivered to the customer. Mr. Wiegand's similar contract required him to deliver by "direct Store Door Delivery". JA2674. Because of this, the trial court found:

> Wiegand's testimony shows that a precursor to the Kroger automated fulfillment center existed in Davis's Sales Area prior to 2011 that was serviced by an ID even though customers did not enter a bricks and mortar location to do so. This, at a minimum, undermines any suggestion by BFBD that, when Davis signed his Distribution Agreement with BFBD, the term "store door delivery" was universally

understood within the industry to exclude a facility that did not permit customers to enter to purchase goods.

JA2436.

**28.** The trial court also found that the plain language of Schedule B of the Distribution Agreement strongly suggests that Mr. Davis need not do more than deliver Products to an Outlet to constitute SDD:

> Pursuant to Schedule B of the Distribution Agreement, an Outlet can be either a retail store, restaurant, or institutional account. . . To constitute an Outlet, the retail store, restaurant, or institutional account must "purchase Products by store door delivery." Davis does not have any restaurants in his Sales Area, but it stands to reason that if he did, he would not be stocking shelves, rotating or removing product, or setting up advertising displays. He would simply be delivering BFBD product to the restaurant. Again, Weigand, a plausible comparator even if not employed by BFBD, who serviced restaurants as an ID, testified that when he serviced such outlets, he "[j]ust dropped [the products] off" Nothing more. And he got compensated.

JA2438 (citations omitted); *see also* JA2569; JA2436; JA2674.

**29.** BFBD's corporate representative acknowledged that while an ID might enter an institutional account or restaurant to drop off Products, he would not undertake all the additional actions that BFBD now claims are required for SDD. JA2438.

**30.** The trial court found that Section 4.1 of the Distribution Agreement "has nothing to do with whether a location qualifies as an Outlet. It is little more than an adjuration that the ID should do what he can to stimulate sales." JA2439. The trial court noted that the Parties agree that "providing service on a basis

consistent with good industry practice," as required by Section 4.1, may include, at times, not taking one or more of the actions listed in that Section.  JA2439.

## II.     Relevant Procedural History.

Mr. Davis takes issue with BFBD's general framing of the case and issues, but does not disagree with BFBD's general description of prior motions, hearings, etc.  Based on the facts above (among others), the trial court made three primary findings:

1.     "[T]he term 'retail store' as used in the Distribution Agreement means a place of business that sells goods directly to the consumer. It does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contact, without the customer entering a brick and mortar location."  JA2434.  As a result, the court concluded that the Kroger Fulfillment Center constitutes a "retail store" under the Distribution Agreement.  JA2434.

2.     Store door delivery means "the delivery of goods directly to a store by a vendor. Activities such as stocking shelves, rotating and removing product, and merchandising, are not required for an ID to engage in 'store door delivery.'"  JA2440.  As a result, the court concluded that the Kroger Fulfillment Center "purchases Products by store door delivery," within the meaning of the Distribution Agreement.  JA2440.

**3.** Because the Kroger Fulfillment Center is a retail store that purchases Products by store door delivery, the facility constitutes an Outlet under the Distribution Agreement. JA2440. As a result, Mr. Davis has the exclusive right to service it, and BFBD breached the Distribution Agreement by prohibiting that and selling to the Kroger Fulfillment Center via other means. JA2440.

Mr. Davis specifically disagrees with BFBD's statement of procedural history as it pertain to the trial court's reliance on *Pastor v. State Farm Mutual Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007) (Posner, J.). *See* BFBD Brief at 13. Mr. Davis addresses this in Section III(B) below.

## SUMMARY OF THE ARGUMENT

**I.** BFBD distorts how the trial court determined that the relevant contractual terms were ambiguous, and how the court then proceeded in evaluating parol evidence and reaching its ultimate conclusions. Section I outlines the trial court's path to decision, highlighting that it made no legal errors along the way.

**II.** Section II supplements BFBD's Standard of Review and statement of governing law.

**III.** Section III addresses BFBD's arguments with respect to the term "retail store". Here, Mr. Davis addresses three main issues:

**A.** The trial court reasonably found the term to be ambiguous because it performed a plain meaning analysis, but found the term reasonably susceptible of

more than one meaning.  This was based on an evaluation of the parties' competing definitions, the dictionary definition, and the usage of trade.  None of this constituted error.  Moreover, BFBD's purported "plain meaning" definition is not supportable, which further indicates ambiguity.  BFBD also relied primarily on an expert witness to define the term, which severely undercuts the suggestion that the term has a plain meaning.

B. The trial court properly applied *Pastor v. State Farm Mutual Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007), by considering a later-clarified contract term when evaluating ambiguity.

C. The trial court's interpretation of "retail store" was reasonable and proper.  First, the primary goal of contract interpretation is to ascertain the intent of the contracting parties.  Mr. Davis presented the testimony of BFBD's representative who brokered Mr. Davis' distribution rights.  That representative agrees with Mr. Davis' interpretation of the term.  This Section then lays out the key factual findings made by the trial court to support its interpretation, and identifies that no evidence supported BFBD's position.

IV. Section IV addresses BFBD's arguments with respect to the term "store door delivery".  Mr. Davis addresses two main issues:

A. The trial court reasonably found the term to be ambiguous after a plain meaning analysis, because it found the term reasonably susceptible of more than one

meaning. This was based on an evaluation of the parties' competing definitions. None of this constituted error. Moreover, BFBD's purported "plain meaning" definition conflicts with other contract terms, rendering them not able to coexist and/or surplusage. BFBD also relied primarily on an expert witness to define the term, which severely undercuts the suggestion that the term has a plain meaning.

**B.** The trial court's interpretation of SDD was reasonable and proper. First, the primary goal of contract interpretation is to ascertain the intent of the contracting parties. Mr. Davis presented the testimony of BFBD's representative who brokered Mr. Davis' distribution rights. That representative agrees with Mr. Davis' interpretation of the term. This Section then lays out the key factual findings made by the trial court to support its interpretation, and identifies that no evidence supported BFBD's position.

**V.** Section V explains that the trial court properly considered course of dealing and course of performance evidence, as allowed by Pennsylvania law. The court was also permitted to, and did, evaluate evidence of the usage of trade. This Section also explains that the court properly admitted opinion testimony from lay witnesses, consistent with the Federal Rules of Evidence. This Section also addresses why this testimony did not improperly allow evidence of "subjective intent" or opinions on legal conclusions.

**VI.**     Section VI addresses BFBD's irrelevant focus on the Fulfillment Center's visual appearance.  The visual appearance of a facility has no bearing on whether a particular location is a retail store that purchases Products by SDD.  BFBD is trying to mislead this Court into believing that the appearance of the Fulfillment Center is dispositive.  BFBD also cites to information and photos not admitted into evidence.

**VII.**     Section VII explains that even if this Court finds some error, the judgment should still be affirmed because it would constitute harmless error.  There was not any single piece of evidence that was dispositive to the trial court; rather the entirety of the evidence supported its judgment for Mr. Davis.  The trial court stated multiple times that BFBD had concocted new definitions to avoid an unwanted outcome under its Agreement.  The trial court did not find any evidence weighed in favor of BFBD.  The judgment would not be swayed by any miscellaneous errors cited by BFBD.

## ARGUMENT

BFBD's brief does not directly identify any discreet factual determinations, evidentiary rulings, or legal conclusions that the trial court purportedly got wrong. Instead, BFBD disagrees with the main legal conclusion that the Kroger Fulfillment Center constitutes an Outlet.  BFBD then maintains that the trial court essentially got everything wrong along the way there.  This is a "throw everything at the wall

and see what sticks" tactic. BFBD has no legitimate dispute with any particular rulings by the trial court; it just wants to see if a new panel of judges might disagree that the Fulfillment Center is a retail store that purchases Products via SDD.

The trial court's reasoning was sound and its conclusions correct. The court determined that both terms were susceptible of more than one meaning, and resorted to parol evidence based on that ambiguity – consistent with Pennsylvania law. In fact, **all** factual evidence supported Mr. Davis' position. BFBD's Brief does not even point to any evidence that supports its own position. Rather, it just repeats the same exact flawed arguments made in BFBD's post-trial briefing – which the trial court considered and rejected.

This Court's role is to review legal conclusions *de novo*. However, those legal conclusions must be reached on the basis of the facts found at trial. BFBD has not challenged **any** factual determinations. And the trial court concluded that all of those factual determinations support Mr. Davis.

Moreover, Pennsylvania courts hold that the primary goal of contract interpretation is to ascertain the intent of the contracting parties. *See Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). Mr. Davis presented the testimony of **BFBD's representative who brokered Mr. Davis' distribution rights and was in the room when the Agreement was signed**. He agrees with Mr.

Davis' interpretation of all key terms. Because the parties' intention when contracting is clear and undisputed, that should end the analysis.

In sum, the trial court did not commit any reversible error. For the following reasons, Mr. Davis requests that this Court affirm the decision and judgment in full.

## I. The Trial Court's Path to Decision.

BFBD distorts how the trial court determined that the relevant contractual terms were ambiguous, and gives the impression that this conclusion was not based on any legal reasoning. A simple reading of the decision authored by the Honorable Judge Peter Messitte – who held the federal bench for over thirty years – reveals that BFBD either misunderstands the opinion or is misrepresenting it to this Court. For that reason, a short summary of the trial court's path to its decision is helpful.

The court quickly honed in on the key question: "Is the Kroger Automated Fulfillment Center an 'Outlet'". JA2426. The court noted that "[t]he primary goal of 'contract interpretation is to ascertain the intent of the contracting parties'" (citing *Ins. Adjustment Bureau*, 905 A.2d at 468), and acknowledged that "[w]hen a contract's language is clear and unambiguous, 'the intent of the parties is to be ascertained from the document itself.' . . . In such circumstances, a contract's language 'shall be given its commonly accepted and plain meaning'" JA2430 (citing *TruServ. Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012)). The court then conducted a plain meaning analysis.

With respect to "retail store", the court looked at the parties' competing definitions. JA2431-2432. The court noted that courts will "consult the dictionary definition of a word to determine its ordinary usage." JA2430. With respect to "retail store" the court found that Merriam-Webster's Online Dictionary potentially suggested two different meanings for the same term, especially when applied to the Kroger Fulfillment Center. JA2432 ("The Court therefore finds the term 'retail store' 'reasonably susceptible of more than one meaning.'"). On that basis, the court properly turned to other evidence. JA2432.

With respect to SDD, the court also looked at the parties' competing definitions. JA2434-2435. The court then cited *Pastor v. State Farm Mutual Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007) (Posner, J.), discussed in greater detail in Section III(B) below, for the proposition that clarification of a contract term in a subsequent comparable contract can establish ambiguity in the original term, permitting recourse to parol evidence. JA2430-2431. From all of this, the court determined there was no plain meaning of SDD, and then properly turned to other evidence. JA2434.

The court was well aware when making these determinations that "a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction," and that "a written contract is ambiguous only when a provision or term 'is reasonably susceptible of more than one meaning.'" JA2430.

The court did not even look to any course of dealing or course of performance until it had found ambiguity in the terms. JA2431; JA2434-2435.

After properly finding an ambiguity in both terms, the court relied upon admissible parol evidence. Section III(C) below outlines all the factual evidence that the trial court relied on its interpretation of "retail store". Based on this admissible evidence, the trial court ruled in Mr. Davis' favor with regard to the meaning of "retail store". JA2434.

Section IV(B) below outlines all the factual evidence that the trial court relied on its interpretation of SDD. Based on this admissible evidence, the trial court ruled in Mr. Davis' favor with regard to the meaning of SDD. JA2440.

In sum, contrary to BFBD's position, nothing about the trial court's path to decision was improper, irregular, or reversible.

## II. Standard of Review and Governing Law.

Mr. Davis does not take issue with the Standard of Review and statement of governing law as laid out by BFBD. *See* BFBD Brief at 25-27. Mr. Davis adds that this Court "review[s] evidentiary rulings for abuse of discretion and will only overturn an evidentiary ruling that is arbitrary and irrational." *Baldassarre v. Norfolk S. Ry. Co.*, 854 Fed. App'x. 540, 540 (4th Cir. 2021) (per curiam).

"Further, a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or exclusion of evidence. . . In a non-jury case, the

admission of incompetent evidence will not warrant reversal unless all of the competent evidence is insufficient to support the judgment, or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would otherwise not have been made." *Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir. 1979) (citing *Multi-Medical Convalescent and Nursing Ctr. of Towson v. N.L.R.B.*, 550 F.2d 974 (4th Cir. 1977)); *see also In re Unisys Sav. Plan Litig.*, 173 F.3d 145,163-64 (3d Cir. 1999) (quoting *Goodman*) *and Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1029-1030 (11th Cir. 2014) (quoting *Goodman*).

Additionally, "[t]he primary goal of 'contract interpretation is to ascertain the intent of the contracting parties.'" JA2430 (citing *Ins. Adjustment Bureau*, 905 A.2d at 468); *see also Wilkes-Barre Tp. Sch. Dist. v. Corgan*, 403 Pa. 383, 386-87, 170 A.2d 97, 98-99 (Pa. 1961) ("[c]ontracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them . . .").

## III. The Fulfillment Center is a "Retail Store".

### A. The Trial Court Reasonably Found Ambiguity.

The trial court's finding of ambiguity should be affirmed. The court properly followed the controlling law in applying a plain meaning analysis and then determining an ambiguity exists.

Section I above addresses how the trial court found ambiguity, including by first conducting a plain meaning analysis as required by Pennsylvania law. JA2430-2431. The court looked at the parties' competing definitions, and then consulted Merriam-Webster's Online Dictionary. JA2431-2432. However, the court found that Merriam-Webster suggested two different meanings for the same term, especially when applied to the Kroger Fulfillment Center. JA2432 ("The Court therefore finds the term 'retail store' 'reasonably susceptible of more than one meaning.'").

The court then properly looked at the context in analyzing the meaning of the term. Pennsylvania follows Restatement (Second) of Contracts § 212 (1981), and Comment (b) provides:

> It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule stated in Subsection (1) is not limited to cases where it is determined that the language used is ambiguous. **Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction**, preliminary negotiations and statements made therein, **usages of trade, and the course of dealing between the parties**.

Restatement (Second) of Contracts § 212 (1981) (emphasis added); *see Olbum v. Old Home Manor, Inc.*, 313 Pa. Super. 99, 109, 459 A.2d 757, 762 (Pa. Sup. Ct. 1983) (quoting § 212); *see also Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 24 (D.D.C. 2017) (same).

The court explained that in 2011 when the Agreement was executed, those in the industry were well aware of fulfillment centers that customers never entered. "From a common sense stand-point, at least, the term 'retail store' as used in the Distribution Agreement could well be understood to cover places of business that sell goods to the ultimate consumer online, with little or no entry of the consumer into the store." JA2431-2432.

On these bases, the court properly found an ambiguity and turned to parol evidence. JA2432. While the court *could have* permissibly considered usages of trade and the course of dealing between the parties pursuant to Restatement § 212, it did not even consider this until it had *already* found an ambiguity.

BFBD's position seems to be that the dictionary definition of "retail store" is itself sufficient to resolve the inquiry, so the court's finding of ambiguity was inappropriate. *See* BFBD Brief at 20, 28-29. As noted above, Pennsylvania law and the Restatement allow, and in fact require, a broader inquiry than just the dictionary definition. The court specifically found that the Merriam-Webster definition did not resolve the ambiguity, because the definition suggested two possible meanings. This is the **exact** scenario where a finding of ambiguity is appropriate. *See Brosovic v. Nationwide Mut. Ins.*, 841 A.2d 1071, 1073 (Pa. Super. Ct. 2004) (a written contract is ambiguous when a provision or term "is reasonably susceptible of more than one meaning.").

BFBD's position is that the dictionary definition's words "in which merchandise is sold", must mean that goods are purchased face-to-face by a consumer from within a physical space.  BFBD Brief at 20, 29.  However, the definition does not say that any purchases or sales must occur within a physical space.  This means either that BFBD is just plain wrong, or the term *is* ambiguous.  This is *exactly* what the court found, and is *exactly* why it found the ambiguity.

BFBD also curiously now suggests for the first time that the Kroger Fulfillment Center is not even a "place of business" "because no business transactions occur at the Fulfillment Center—it is a storage and shipping facility." BFBD Brief at 20, 29.  BFBD provides no support for this notion.  Looking once again to Merriam-Webster's Online Dictionary, "place of business" is defined as "a place, such as a store, bank, etc., where business is done."[2]  "Business" is defined in this context as "a usually commercial or mercantile activity engaged in as a means of livelihood."[3]  The Kroger Fulfillment Center easily meets that definition, because it is a *place* where *commercial activity* is engaged in.

BFBD's interpretation is further undermined by the Merriam-Webster definition itself: "a place of business usually owned and operated by a retailer **but sometimes owned and operated by a manufacturer or by someone other than a**

---

[2] *See* https://www.merriam-webster.com/dictionary/place%20of%20business.
[3] *See* https://www.merriam-webster.com/dictionary/business.

**retailer** in which merchandise is sold primarily to ultimate consumers." *See* JA2432; JA3014. This clarifies that <u>non-retailers</u> can still own and operate "retail stores". If BFBD was correct that in-person business transactions must occur within a physical space to constitute a retail store, it would write these non-retailers out of the Merriam-Webster definition, because hand-to-hand sales are very unlikely to occur in a manufacturing warehouse. On the other hand, many manufacturers sell merchandise to the ultimate consumer directly from a manufacturing warehouse (without customers entering), and the Merriam-Webster definition accounts for this.

Notably, BFBD now adopts the Merriam-Webster definition for "retail store". *See* BFBD Brief at 2, 20. However, this was <u>not</u> BFBD's position on summary judgment or at trial. *See generally* JA712; JA2292. The fact that BFBD has now pivoted to *support* this definition, for the first time on appeal, further confirms the conclusion that the term does not have a plain meaning and is ambiguous.

It is also worth noting that BFBD's Brief refers to "retail store" as "a commonly used, non-technical term," but BFBD still felt compelled to engage an expert witness to define the term in this case. *See* BFBD Brief at 28. BFBD could not provide an intelligible definition for the term in its interrogatory responses. *See* JA3081-3082 ("Defendant states that the term 'retail stores' takes on its ordinary meaning within the context of the distribution agreement and consistent with industry custom and trade usage."); JA1935-1936 (BFBD corporate representative

testimony re: same). This all undermines any suggestion that the term has a common, plain meaning. To the contrary, it supports a finding of ambiguity.

For these reasons, this Court should affirm the trial court's finding that the term "retail store" is ambiguous in this context.

## B. The Court Properly Applied *Pastor v. State Farm*.

BFBD attacks the trial court's reliance on *Pastor v. State Farm Mutual Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007). BFBD Brief at 34; *see also* JA2430-2431. However, BFBD greatly mischaracterizes the trial court's use of *Pastor* and the decision in *Pastor* itself. *Pastor* stands for two propositions:

1. A clarified contract term **cannot** be used to prove the **meaning** of an original version of that term; **but**

2. A clarified term **may** be used to evaluate and identify ambiguity in an earlier version of that contract term.

In relevant part, the Seventh Circuit stated:

> The subsequent version of the clause, in which State Farm made explicit that "day" means 24 hours, and which State Farm describes as a clarification, Pastor deems a confession that her interpretation of the original clause is correct. Obviously it is not a confession. And to use at a trial a revision in a contract to argue the meaning of the original version would violate Rule 407 of the Federal Rules of Evidence, the subsequent-repairs rule, by discouraging efforts to clarify contractual obligations, thus perpetuating any confusion caused by unclarified language in the contract.

*Pastor*, 487 F.3d at 1045. That court then discussed allowing extrinsic evidence only to establish an ambiguity. *Id.* at 1046.

This is consistent with Federal Rule of Evidence 407 itself, which only prohibits evidence of subsequent repairs for four limited purposes (not at issue here), but states that "the court may admit this evidence for another purpose . . . ." Fed. R. Evid. 407. Therefore, the trial court was permitted to admit evidence of the clarified contract terms for purposes of determining ambiguity.

In *American Cas. Co. of Reading, Pennsylvania v. Continisio*, 819 F. Supp. 385 (D. N.J. 1993), the District of New Jersey held:

> The FDIC argues that a subsequent, more precise revision of the notice provision demonstrates that the Notice of Claims provision in the 1981 Policy is ambiguous. Evidence of subsequent changes in contract language is relevant to whether the language at issue is ambiguous. . . The insurers argue that subsequent revisions of the policy language should be excluded under Fed.R.Evid. 407, which excludes evidence of subsequent repairs offered for the purpose of showing negligence or culpable conduct. Since the subsequent revisions are offered by the FDIC for the purpose of showing the ambiguity of the earlier contractual language, this objection is without merit.

*Continisio*, 819 F. Supp at 398, 398 n.8. *See also Jones v. Benefit Tr. Life Ins. Co.*, 800 F.2d 1397, 1400 (5th Cir. 1986) (allowing evidence of subsequent change in a policy document, over Rule 407 objection, when offered for ambiguity analysis).

The trial court's reliance on a clarified contract term fits squarely within this permissible use. *See* JA2430-2431; *see also* JA2739 (current form of distribution agreement with clarified terms). The trial court **never** relied on any clarified contract

term as parol evidence.  Instead, the court relied on the clarified term to establish the **ambiguity** of the term – which therefore would allow the evaluation of **other** parol evidence.

BFBD points to the court's statement that "[t]he Court has already suggested that BFBD, by its recent amendment to its distribution agreements, belies its insistence that term has a plain meaning and parol evidence clearly cuts against BFBD's formulation." JA2431.  This further supports Mr. Davis' position here.  The court did not say that the recent amendment was parol evidence; rather the amendment undermined BFBD's assertion of plain meaning.  That allowed resort to *other* parol evidence, which is discussed at length beginning in the very next sentence of the opinion.

### C.   The Trial Court's Interpretation of "Retail Store" was Reasonable and Proper.

The court's ultimate interpretation of "retail store" in the context of the Distribution Agreement was reasonable and proper.  Therefore, this Court should affirm that interpretation.

At the outset, Pennsylvania courts hold that the primary goal of contract interpretation is to ascertain the intent of the contracting parties.  *See Ins. Adjustment Bureau*, 905 A.2d at 468.  Mr. Davis presented the testimony of **BFBD's representative who brokered Mr. Davis' distribution rights, and was in the room when the Agreement was signed**.  JA2432.  He agrees with Mr. Davis'

interpretation of the term "retail store". JA2432-2433. Because the parties' intention when contracting is clear and undisputed, that should end the analysis.

Nevertheless, the court additionally found the following facts supporting Mr. Davis:

1.      The Merriam-Webster definition by its terms does <u>not</u> require that customers must physically buy merchandise from within a facility. JA2432.

2.      In addition to Mr. Taylor, two other former BFBD employees agree with Mr. Davis' definition of the term "retail store". JA2432-2433. All of them agree that a grocery fulfillment center fits within the definition of a "retail store". JA2432-2433.

3.      BFBD and its expert cannot support their definition in any way, and BFBD's definition "appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with." JA2433-2434.

4.      Because fulfillment centers were open and operating in 2011 when the Agreement was signed, the term "retail store" could be understood to cover locations like a fulfillment center. JA2431-2432.

On the flip side, the court did not find **any** factual evidence that supported BFBD's position. The court's decision was therefore reasonable and proper.

BFBD argues that if the Kroger Fulfillment Center is a "retail store", then "every step in a product's supply chain from production, to storage, to shipping, is a

'retail store.'" BFBD Brief at 39. This argument is disingenuous and ignores the plain text of the Merriam-Webster definition. The definition requires that merchandise be "sold primarily to ultimate consumers." JA3014. Kroger's manufacturing facilities and storage locations do not sell anything to the ultimate consumer. The Kroger Fulfillment Center, on the other hand, *does* sell and deliver goods primarily to ultimate consumers. BFBD improperly skips over this key part of the Merriam-Webster definition.

## IV. The Fulfillment Center Purchases Products by "Store Door Delivery".

### A. The Trial Court Reasonably Found Ambiguity.

The trial court's finding of ambiguity should be affirmed. The court properly followed the controlling law in applying a plain meaning analysis and then determining an ambiguity exists.

Similar to its analysis with "retail store", the trial court first followed the plain meaning analysis required by Pennsylvania law. JA2430-2431; JA2434; *see also* Section I herein. The court looked at the parties' competing definitions and determined that SDD has no plain meaning. JA2434. Only after finding an ambiguity, the court turned to parol evidence. JA2434. While the court *could have* permissibly considered usages of trade and the course of dealing between the parties pursuant to Restatement § 212, it did not even consider this until it had *already* found an ambiguity.

BFBD argues that the term's meaning can be derived from the other terms of the Distribution Agreement, most notably Section 4.1. BFBD Brief at 20, 24, 31-32. Section 4.1 states:

> RESULTS: In order to maximize its purchases from BFBD, DISTRIBUTOR agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area. . .

JA2555. Section 4.1 does not mention SDD at all. Section 4.1 is not part of the definition of the term "Outlet" or SDD. Section 4.1 simply lists certain actions Mr. Davis may take in order to maximize sales. JA247; JA2439. Importantly, the parties agree that "providing service on a basis consistent with good industry practice" may include, at times, not taking one or more of the actions listed in Section 4.1, especially when directed by the Outlet at issue. JA247; JA2439.

As the court aptly pointed out, Section 4.1:

> has nothing to do with whether a location qualifies as an Outlet. It is little more than an adjuration that the ID should do what he can to stimulate sales. The Parties agree that "providing service on a basis consistent with good industry practice," as required by Section 4.1 may include, at times, not taking one or more of the actions listed in that Section. . . If an Outlet specifically requests that an ID not provide one or more of the services listed in Section 4.1, BFBD has never insisted that an ID must ignore that request in order to comply with the Section

or, if the ID would not or could not do so, that he would be taken off the account.

JA2439.

Moreover, if BFBD was correct that SDD already included all of the elements it suggests, Section 4.1 wouldn't need to state what it does. 4.1 would simply state that "Mr. Davis agrees to perform store door delivery." Or it wouldn't say anything at all, because Outlets would already require SDD pursuant to Schedule B. BFBD misunderstands that Section 4.1 exists precisely because SDD **does not** already require those actions. *See Ungarean v. CNA*, 286 A.3d 353, 374-75 (Pa. Super. Ct. 2022) ("It is axiomatic that courts must 'not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language.'").

BFBD asserts that, because IDs take those other actions in certain cases, then SDD **must** include those actions. However, BFBD presents no support for that position. By way of analogy, that would be similar to arguing that the phrase "legal research" in an attorney's employment contract also includes other duties such as filing pleadings and attending court hearings, simply because many attorneys also take those other actions when requested by their clients. BFBD's position here is similarly flawed and unreasonable.

BFBD's citation to *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74 (2d Cir. 2020) does not change this. *See* BFBD Brief at 30. As that court observed (and

BFBD quotes), "**operating their businesses required** more than the ability to drive; **their success depended** on their ability to increase sales, build customer relationships, effectively identify the popularity of different products, hire and train employees, and manage profits and losses." *Franze*, 826 F. App'x at 78 (emphasis added). The *Franze* court stated that those elements were required to operate an ID's business, and to increase the likelihood of success in that business. The court **did not** state that those actions were required by SDD, or had any relation to the term SDD. In fact, that term does not even appear in the opinion.

While BFBD cites this one inapposite case, other case law supports Mr. Davis' interpretation of SDD. Mr. Davis's post-trial briefing cited at least four cases where the court interpreted SDD (or DSD) the same as Mr. Davis. *See* JA2242-2243 (citing *PepsiCo v. Cent. Inv. Corp.*, 271 F. Supp. 2d 1040 (S.D. Ohio 2001); *Carpenter v. Pepperidge Farm, Inc.*, 2023 WL 4552291 (E.D. Pa. July 14, 2023) (slip copy); *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180 (D. Colo. 2023); *Canales v. CK Sales Co.*, 67 F.4th 38 (1st Cir. 2023)). Mr. Davis incorporates this discussion from its post-trial briefing by reference. None of these cases mention other elements being required for SDD, such as stocking shelves and merchandising.

It is worth noting that BFBD argues that SDD has plain meaning and is unambiguous, but again resorted solely to an expert witness to define the term in this case. BFBD could not provide an intelligible definition for the term in its

interrogatory responses. *See* JA3083-3084 ("Defendant states that the term 'store door delivery' takes on its ordinary meaning within the context of the distribution agreement and consistent with industry custom and trade usage."); JA1937-1938 (BFBD corporate representative testimony re: same). This all undermines any suggestion that the term has a common, plain meaning. To the contrary, it supports the trial court's finding of ambiguity.

For these reasons, this Court should affirm the trial court's finding that the term "store door delivery" is ambiguous in this context.

**B.    The Trial Court's Interpretation of "Store Door Delivery" was Reasonable and Proper.**

The court's ultimate interpretation of "store door delivery" in the context of the Distribution Agreement was reasonable and proper. Therefore, this Court should affirm that interpretation.

As noted, the primary goal of contract interpretation is to ascertain the intent of the contracting parties. *See Ins. Adjustment Bureau*, 905 A.2d at 468. Mr. Davis presented the testimony of **BFBD's representative who brokered Mr. Davis' distribution rights, and was in the room when the Agreement was signed**. JA2432. He agrees with Mr. Davis' interpretation of the term "store door delivery". JA2432-2433; JA2435-2436. Because the parties' intention when contracting is clear and undisputed, that should end the analysis.

Nevertheless, the court additionally found the following facts supporting Mr. Davis:

1.      The Dictionary of International Trade, published the year before Mr. Davis signed his Distribution Agreement, comports with Mr. Davis' interpretation of the term.  JA2435; JA3026.

2.      The FMI, which BFBD's expert described as "the leading food retailing association in the United States," publishes a Food Industry Glossary that defines DSD as "[p]roducts delivered directly to a store by the vendor, such as soft drinks, beer, bread and fresh baked goods, [etc.]."  JA2435; JA3040.

3.      In addition to Mr. Taylor, two additional former BFBD employees agree with Mr. Davis' definition of the term SDD.  JA2432-2433.  All of them agree that a grocery fulfillment center utilizes SDD.  JA2435.

4.      Mr. Wiegand previously serviced a fulfillment center under substantially similar contract terms, and a predecessor to BFBD permitted Mr. Wiegand to service the Peapod.  JA2436; JA2674.

5.      The plain language of Schedule B weighs heavily against BFBD, because "Outlets" also include restaurants and institutional accounts (i.e., schools, prisons, etc.).  All Outlets must use SDD to qualify.  If SDD *always* requires the elements BFBD suggests (stocking shelves, setting up marketing, etc.), an ID could

**never** have a restaurant or institutional account as an Outlet.[4]  JA2438; *see also* JA2569.

**6.**    Section 4.1 of the Distribution Agreement "has nothing to do with whether a location qualifies as an Outlet. It is little more than an adjuration that the ID should do what he can to stimulate sales."  JA2439.

**7.**    BFBD and its expert could not support their definition in any way. JA2436-2437.  According to the court, "**BFBD simply appears to have crafted a new melody for modern times.**"  JA2436 (emphasis added).

**8.**    To the contrary, BFBD's expert cited the Bishop Article, published in 2011, which the court found weighed *against* BFBD's position.  JA2437; JA2771; JA2774.

**9.**    The court pointed out BFBD's conflicting testimony on the required actions to constitute SDD, calling it a "**conveniently malleable reading of a contract term making it possible for BFBD to cut off an ID's claim for potentially thousands of dollars whenever it decided to do so.**"  JA2437-2438 (emphasis added).

---

[4] Mr. Wiegand did service restaurants as an ID under an agreement that used the term "direct Store Door Delivery".  JA2436; JA2438; JA2674.  Mr. Wiegand simply dropped off products and left, without any other service.  Yet he was still allowed to service that facility, and was paid.  JA2438.

Again, the court did not find **any** factual evidence that supported BFBD's position. The court's decision was therefore reasonable and proper.

BFBD argues that Mr. Davis could never perform the actions listed in Section 4.1 of the Agreement (which BFBD says are required for SDD) in the Kroger Fulfillment Center. BFBD Brief at 7, 23, 30. This is irrelevant. As a factual matter, the court found that "[t]he Parties agree that 'providing service on a basis consistent with good industry practice,' as required by Section 4.1 may include, at times, not taking one or more of the actions listed in that Section." JA2439. Moreover, an Outlet's grocery manager dictates the type and level of service desired, and that has never precluded Mr. Davis from servicing an Outlet until now. JA2427; JA2439.

BFBD further argues, in effect, that if SDD means just delivery of products to a store's door, then the Agreement would have just used the term "delivery" rather than "store door delivery". BFBD Brief at 24-25; 30-31; 40-41. Similarly, BFBD argues that because Schedule B refers to "methods other than store door delivery", the trial court's interpretation of SDD effectively writes that provision out of the Agreement. BFBD Brief at 40-41.

This is another unconvincing argument that BFBD asserted at trial, and it must fail again. There are numerous other types of delivery or distribution channels that would fall outside of the court's definition that would constitute plain "delivery". In response to examination on this topic, Mr. Davis testified that if a manufacturer

delivered straight to a consumer's home, that would be basic "delivery" as opposed to "store door delivery", because no store is involved at all. JA1667 (Tr. Vol. 2, at 282:17-25). Mr. Davis also testified that SDD requires that a location be a store with a door: "You are delivering to a store that has a door. I'm not allowed to deliver to a place that doesn't have a door. Like, I can't sell off the back of my truck." JA1645 (Tr. Vol. 2, at 260:14-21).

A retailer may also opt to pick up products from BFBD's manufacturing facility or warehouse. This would clearly be outside of the court's definition, which requires the goods to be **delivered to the** retailer. These are just a few basic examples of distribution channels that would constitute something other than SDD, but others exist as well. Therefore, BFBD's argument does not hold up.

Accordingly, the court's interpretation does not write any provision out of the Distribution Agreement. To the contrary, BFBD's interpretation would effectively eliminate restaurants and institutional accounts from ever becoming an Outlet, thereby impermissibly writing those types of facilities out of Schedule B to the Agreement. BFBD's interpretation would also render nearly all of Section 4.1 superfluous, because if SDD already requires all of those actions, there would be no reason for Section 4.1 to restate them. *See Flatley by Flatley v. Penman*, 632 A.2d 1342, 1345 (Pa. Super. Ct. 1993) (rejecting an interpretation that would render a contractual provision "either superfluous or inexplicably inconsistent" while noting

that the court must "seek to give meaning to all terms while maintaining an internally consistent document").

## V.  Course of Performance and Course of Dealing.

BFBD argues that the trial court cited to "course of performance" or "course of dealing" evidence, but that "no such evidence exists."  BFBD Brief at 22, 23, 35-36.  First, that is not correct.  Second, even if BFBD is arguing that the court looked at usage of trade as opposed to course of dealing/performance, resort to usage of trade was permissible as well.

As a threshold matter, BFBD cites the Pennsylvania Uniform Commercial Code, which only applies when the transaction involves predominantly the sale of goods.  BFBD Brief at 35; *see also Whitmer v. Bell Tel. Co. of Pa.*, 522 A.2d 584, 587, 3 UCC Rep. Serv. 2d 12 (Pa. Sup. Ct. 1987).  The trial court did not cite the UCC, and no determination was made that the UCC governs here, where substantial services are involved.  BFBD has not made any showing that the UCC applies, so it fails to meet its burden on this ground of appeal as an initial matter.

In any event, the trial court **did** properly consider "course of performance" and "course of dealing" evidence.  BFBD's main argument to the contrary is that because an "automated Fulfillment Center is an innovation of the last five years, which the parties have never encountered over the course of their contractual relationship . . . [t]here is therefore no 'course of dealing' or 'course of performance'

between the parties dealing with a situation like the Fulfillment Center to illuminate the parties' intent." BFBD Brief at 35-36. While BFBD wants to solely look to prior occasions where this *precise fact pattern* has arisen between the parties, this is far too narrow of an inquiry.

As BFBD acknowledges, the UCC provides that "[a] 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if . . . the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party." BFBD Brief at 35 (citing 13 Pa. Con. Stat. § 1303(a)). Similarly, "course of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." BFBD Brief at 35 (citing 13 Pa. Con. Stat. § 1303(b)).

Here, the parties have repeated their performance under the Distribution Agreement on a near-daily basis since 2011. JA2425-2426. The court outlined the actions Mr. Davis typically takes, and then explained that "sometimes Outlets have explicitly requested that Davis not take one or more of the actions listed in Section 4.1." JA2426-2427. The court concluded, "**That arrangement has never, until the onset of this litigation, precluded Davis from receiving compensation from**

**BFBD** under the Distribution Agreement." JA2427 (emphasis added). Similarly, the court observed:

> The Parties agree that "providing service on a basis consistent with good industry practice," as required by Section 4.1 may include, at times, not taking one or more of the actions listed in that Section. . . If an Outlet specifically requests that an ID not provide one or more of the services listed in Section 4.1, **BFBD has never insisted that an ID must ignore that request in order to comply with the Section or, if the ID would not or could not do so, that he would be taken off the account**.

JA2439 (emphasis added).

This is the course of dealing and performance that the court relied upon. The parties engaged in a sequence of conduct for over a decade whereby Mr. Davis may forego some or all of the actions BFBD now insists are part of SDD. However, until now, that never prevented Mr. Davis from servicing an Outlet, or stopped BFBD from paying Mr. Davis. That is quintessential course of dealing and course of performance evidence. *See also* Restatement (Second) of Contracts § 202(4) (1981) ("Where an agreement involves repeated occasions for performance by either party . . . any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

BFBD suggests that the court looked at third-parties' interactions with BFBD, and improperly considered that as course of dealing or course of performance evidence. BFBD Brief at 36. This is simply not true. *See* JA2431 ("Putting aside for the moment how **the Parties themselves** have defined these terms over their

course of dealing or course of performance"); JA2434-2435 (referring to "the course of dealing and course of performance **as between the parties**"). BFBD can point to no portion of the opinion where the court cited third-parties' interactions as course of dealing or performance.

To be clear, third parties – former BFBD employees – **did** provide opinion testimony about their interpretation of the two terms at issue in this case. However, this was not admitted as course of dealing or performance evidence. BFBD's actual concern is that the court admitted damaging opinion testimony from lay witnesses. However, this is expressly permitted by Federal Rule of Evidence 701. In fact, BFBD has not even argued that this testimony should have been excluded under FRE 701. These witnesses were entitled to testify as to the foundation of their personal knowledge and provide lay opinions.

Notably, the Pennsylvania UCC also allows evidence of usage of trade, defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." 13 Pa. Con. Stat. § 1303(c). Federal courts regularly allow lay testimony on industry custom and trade usage. *See United States v. Thompson*, 229 F. Supp. 3d 91, 94 (D. Mass. 2017) ("The defendants offer David Tiernan as a witness on industry custom and practice. David Tiernan is an executive of an environmental consulting company who has experience working with asbestos

abatement companies and clients who retain those companies. He testified that he has experience with construction contract bidding and that through that experience, he has commonly observed the existence of a union company and nonunion company operating out of the same location with similar names, sharing management and laborers. He may testify at trial as to those observations."); *Sec. and Exch. Comm'n v. Ambassador Advisors, LLC*, No. 5:20-cv-02274-JMG, 2022 WL 2188145, at *4 (E.D. Pa. Feb. 28, 2022) ("Insofar as Plaintiff's motion seeks to preclude Defendants from eliciting testimony from lay witnesses as to industry custom and practice, as to Defendants' mental state, and as to whether Defendants' advisory fees were low, the motion is DENIED without prejudice to Plaintiff's right to renew the objection at trial. Lay witnesses can testify to their personal experiences with technical or specialized subject matter."); *Vyanet Operating Grp., Inc. v. Maurice*, No. 21-cv-02085-CMA-SKC, 2023 WL 3268556, at *3 (D. Colo. May 5, 2023) ("The Court finds that it would not be 'expert' testimony for either Mr. Jones or Mr. Warner to testify to their personal experience involving acquisitions at Vyanet. Such testimony is not 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.' . . . Rather, this testimony constitutes lay witness testimony based on 'the particularized knowledge that the witness has by virtue of his or her position in the business.' Fed. R. Evid. 701, advisory committee notes to 2000 amendments . . ."); *Anzora v. Lezama*, No. 17-cv-01983-DDD-NRN,

2019 WL 3334685, at *7 (D. Colo. July 24, 2019) ("Rule 701 opinion testimony results from a process of reasoning familiar in everyday life or knowledge that the witness has by virtue of his or her position within a particular field, while Rule 702 opinion testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'"); *United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011) ("Rejecting the impractical notion that lay persons be required to testify only to pure facts when relating their knowledge of an incident, the rule allows testimony based on the person's reasoning and opinions about witnessed events, such as are familiar in every day life.").

Importantly, under Pennsylvania law, "[e]vidence of industry custom or trade usage '**is always relevant and admissible** in construing commercial contracts,' **and does not depend on the existence of ambiguity**[5] in the contractual language. Where it can be shown that words have a special meaning or usage in a particular industry, 'members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.'" *Gen. Refractories Co. v. First State Ins.*

---

[5] This further undermines BFBD's claims that the trial court improperly found an ambiguity, because the court could have considered the industry custom and trade usage *before* finding ambiguity.

*Co.*, 855 F.3d 152, 160 (3d Cir. 2017). Accordingly, the third-party witnesses were permitted to offer their testimony on this basis as well.[6]

BFBD argues that the trial court improperly focused on some witnesses' "subjective intent". BFBD Brief at 36-37. It is unclear where BFBD believes this occurred. Mr. Davis and each of the third-party witnesses all testified as to their understanding and interpretation of two terms: "retail store" and "store door delivery". JA2432-2436. None of these witnesses were asked about, or provided any testimony concerning, their subjective intent of what Mr. Davis' contract means.

The cases BFBD cites for this proposition bear no resemblance to the facts here. In *DiNenna v. DiNenna*, 304 A.3d 738 (Table) (Pa. Sup. Ct. 2023), the court evaluated an agreement whereby a husband agreed to pay his wife some amount of a pension after a divorce. However, the husband identified "collateral matters to explain why he would not have agreed to give Wife forty-five percent of his entire pension. Put another way, he tries to convince us of the parties' subjective intent, and why it is contrary to the express language used in the contract." *Id.* There was no similar testimony here from any witness of their intent when entering into the Agreement.

---

[6] The same is true for Mr. Wiegand's testimony about servicing a separate Peapod fulfillment center, so BFBD's argument in this regard must be rejected as well. *See* BFBD Brief at 36 n.6.

*Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 520 (E.D. Pa. 2010), is even less applicable. As quoted in BFBD's brief, "**[e]xtrinsic evidence to show ambiguity** in a contract can only be evidence that addresses the meaning of a specific term in the contract, and not the subjective intent of the parties." The court did not rely on any subjective intent from any witness in determining an ambiguity existed. In fact, the court did not even consider the third-party witnesses' testimony until *after* an ambiguity was found.

Finally, BFBD argues that certain testimony impermissibly offered opinions on the legal obligations of the parties. *See* BFBD Brief at 37-38. Again, no witness offered any such testimony. Mr. Davis and each of the third-party witnesses all testified as to their understanding and interpretation of retail store and SDD in the industry. JA2432-2436. None of these witnesses were asked about, or provided any testimony concerning, the parties' legal obligations.

To agree with BFBD on this point would effectively prohibit **any** parol evidence, or **any** testimony about course of dealing, course of performance, or usage of trade. As explained above, all of this is generally admissible. At some level, all of this factual evidence goes to the ultimate determination of the parties' legal obligations. That is not the same as offering an opinion on the legal interpretation of a contract or the legal obligations of parties to a contract. Paradoxically, if this Court *did* agree with BFBD on this point, that would also preclude all testimony

from BFBD's expert, because his sole role was to offer opinions on the interpretation of the same two terms.

## VI. The Visual Appearance of the Fulfillment Center is Irrelevant.

Similar to its strategy at trial, BFBD focuses on the visual appearance of the Kroger Fulfillment Center, and the fact that it uses robotics. *See* BFBD Brief at 1-2, 6-9, 20. BFBD's argument is essentially that the Fulfillment Center does not look like a traditional grocery supermarket, so therefore it cannot be a "retail store" and it cannot use "store door delivery". However, the visual appearance of a facility has no bearing on whether a particular location is a retail store that purchases Products by SDD. The parties' Agreement does not contain any requirements about how a facility must **look** in order to be an Outlet, and BFBD has presented no persuasive reason why the Court should even consider that factor.

Importantly, one of Mr. Davis' current Outlets is a Sam's Club warehouse store. JA1464 (Tr. Vol. 1, at 79:11-14). The Sam's Club – which is an enormous warehouse that also sells goods such as furniture, tires, and electronics, and has shelving two floors tall – certainly does not match the **look** of a traditional grocery supermarket. Nevertheless, there has never been any suggestion that the Sam's Club is not Mr. Davis' Outlet because it looks a certain way.

In addition, to make this point BFBD relies almost entirely on information or photos that were never admitted as evidence. For instance:

- Pg. 7: citations to JA706 and JA707 are to pages from BFBD's memorandum of law in support of its motion for summary judgment;

- Pg. 7: citation to JA2283 is to a page from BFBD's post-trial brief;

- Pgs. 7-8, 29, 38: citations to JA1976-1982 are to testimony from Ken Gronholm, a BFBD employee. However, Mr. Gronholm has never been to the Kroger Fulfillment Center in Frederick, Maryland. *See* JA1996 (Tr. Vol. 3 at 611:9-15). The trial court found all of his testimony to be hearsay, and also of very little relevance. *See* JA1967-1979 (Tr. Vol. 3 at 582:14-594:8);

- Pg. 9: citation to JA2621 (second image on page) is from Plaintiff's Exhibit 17, which was admitted. However, there is no evidence that this image is from the Kroger Fulfillment Center in Frederick, Maryland. In fact, the PowerPoint presentation at Plaintiff's Exhibit 17 is dated six months before the Kroger Fulfillment Center even opened for operations. *See* JA2617 and JA2428. This image is also hearsay, because no witness testified that this is what the Kroger Fulfillment Center looks like;

- Pg. 9: citation to JA2622 (first image on page) is actually to a blank image from the same PowerPoint presentation. It is not clear where this image actually came from; and

- Pg. 10: citation to JA406 is to a page from an exhibit to Mr. Davis' memorandum of law in support of his motion for summary judgment.

However, there is no evidence that this page even refers to the Kroger Fulfillment Center in Frederick, Maryland.

In sum, none of this is evidence and this Court should not rely on it.

BFBD is trying to mislead this Court into believing that the appearance of the Kroger Fulfillment Center is dispositive. However, regardless of how it looks, the Kroger Fulfillment Center sells grocery products to the end consumer, and purchases Products via store door delivery. It is an Outlet.

## VII.  Harmless Error.

To the extent this Court agrees with BFBD that any factual determination, evidentiary ruling, or legal conclusion was improper, that does not end the inquiry. This Court must also find that a substantial right of BFBD was affected. *See* 28 U.S.C. § 2111 (". . . the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (rev'd on other grounds) (citing 28 U.S.C. § 2111 and FRCP 61); Fed. R. Evid. 103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party. . .").

To find harmless error, this Court "'need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s].' . . . This test appropriately focuses upon 'whether the error itself had substantial influence.'" *Taylor*, 193 F.3d at 235.

"Further, a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or exclusion of evidence. . . In a non-jury case, the admission of incompetent evidence will not warrant reversal unless all of the competent evidence is insufficient to support the judgment, or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would otherwise not have been made." *Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir. 1979) (citing *Multi-Medical Convalescent and Nursing Ctr. of Towson v. N.L.R.B.*, 550 F.2d 974 (4th Cir. 1977)); *see also In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999) (quoting *Goodman*) *and Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1029-1030 (11th Cir. 2014) (quoting *Goodman*).

Even if any trial court action was error, BFBD cannot meet this standard (and it has not even sought to argue that it can). There was not any single piece of evidence that was dispositive to the trial court; rather the entirety of the evidence supported its judgment for Mr. Davis. The trial court stated multiple times that it

felt that BFBD had concocted new proposed definitions to avoid an undesired outcome under the Parties' Distribution Agreement. With respect to "retail store", the court stated, "what BFBD has proposed as a definition . . . frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with." JA2434. With respect to SDD, the court said "BFBD simply appears to have crafted a new melody for modern times," and pointed out BFBD's "conveniently malleable reading of a contract term making it possible for BFBD to cut off an ID's claim for potentially thousands of dollars whenever it decided to do so." JA2436 and JA2438.

The trial court did not find **any** evidence weighed in favor of BFBD. On the other hand, the court found numerous items of factual evidence weighed in Mr. Davis' favor for **both terms**. *See* Argument Sections III(C) and IV(B), *supra*, outlining the specific facts found by the court supporting its interpretation of both terms of the Distribution Agreement. Even if any piece of evidence **was** improperly admitted (which BFBD has not met the standard to show), it was harmless error because the ultimate judgment was not swayed by such error.

As noted previously, BFBD does not directly identify any determinations, rulings, or conclusions that the trial court purportedly got wrong. The thrust of BFBD's argument appears to be that all the trial court's decisions and actions combined to form an improper legal conclusion. This Circuit has previously rejected

such a claim as not even viable (albeit, in a criminal context). In *United States v. Zehrbach*, 98 Fed. App'x. 211 (4th Cir. 2004), this Court stated:

> Defendants, however, do not contend that any one of the district court's evidentiary rulings was an abuse of discretion. Rather, Defendants argue that the combined effect of the district court's evidentiary rulings deprived them of a fair trial. This Circuit has no published opinions addressing such a "combined effects" claim, and we are doubtful that such a claim is viable. . . Appellants have not pointed us to any authority on this point. And, we have not found any published decisions from our sister circuits addressing such a claim either.

*Zehrbach*, 98 Fed. App'x at 223-24 and n.24. BFBD's attempt to use this strategy should fail here as well.

## <u>CONCLUSION</u>

For these reasons, this Court should affirm the decision below, find that the Fulfillment Center is an "Outlet" under the Distribution Agreement as a matter of law, and affirm entry of judgment in favor of Plaintiff-Appellee Walter R. Davis.

**Dated:  April 30, 2025**            **Respectfully Submitted,**


                                      */s/ Daniel R. Miktus*
                                      Daniel R. Miktus
                                      J. Travers Clark
                                      AKERMAN LLP
                                      750 Ninth Street, N.W., Suite 750
                                      Washington, D.C. 20001
                                      Tel:  (202) 393-6222
                                      Fax:  (202) 393-5959
                                      daniel.miktus@akerman.com
                                      trav.clark@akerman.com
                                      *Counsel for Plaintiff-Appellee*
                                      *Walter R. Davis*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the portions of the document exempted by Rule 32(f), it contains 12,954 words. This brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

**Dated:  April 30, 2025**                    **Respectfully Submitted,**

*/s/ Daniel R. Miktus*
Daniel R. Miktus
J. Travers Clark
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel:  (202) 393-6222
Fax:  (202) 393-5959
daniel.miktus@akerman.com
trav.clark@akerman.com
*Counsel for Plaintiff-Appellee*
*Walter R. Davis*